**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

EMILY ODERMATT,

                *Plaintiff*,

   v.

THE MOUNT SINAI HOSPITAL, MOUNT
SINAI HEALTH SYSTEM, INC., and
MOUNT SINAI HOSPITALS GROUP, INC.,

                *Defendants*.

**Civil Action No.**

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Emily Odermatt, through her attorneys, Eisenberg & Baum, LLP, states her Complaint against Defendants Mount Sinai Hospital, Mount Sinai Health System, Inc., and Mount Sinai Hospitals Group, Inc. (collectively, "Mount Sinai"):

**INTRODUCTION**

1.    For most people, the ability to initiate sleep at a regular time may be taken for granted. However, Emily Odermatt has Delayed Sleep Phase Syndrome ("DSPS"), which is a circadian rhythm sleep disorder that causes her to experience a kind of insomnia as well as extreme daytime drowsiness and difficulty staying alert during the day.

2.    Ms. Odermatt also has Attention-Deficit / Hyperactivity Disorder ("ADHD"), a chronic condition that causes her to have trouble managing her attention.

3.    Ms. Odermatt's DSPS and ADHD conditions make it exceedingly difficult to stay alert and attentive, particularly in the earlier parts of the day.

4.    Ms. Odermatt went to appointments at Mount Sinai, which consistently failed to accommodate her DSPS and ADHD. She sought treatment and care from the Mount Sinai Hospital Adult Outpatient Ambulatory Psychiatry Clinic ("Mount Sinai Clinic") located at 1160 Fifth

1

Avenue, Basement Suite, New York, NY 10029.

5.     As a result of her sleep disorder, Ms. Odermatt has a delayed sleep schedule and requested late-afternoon appointments (i.e., 2:30 PM for telehealth appointments or 3:00 PM for in-person appointments) to receive equal treatment.

6.     In September 2023, Ms. Odermatt was removed from the waitlist for psychiatric care and invited for an in-person intake appointment at the Mount Sinai Clinic.

7.     During the initial phone conversation to schedule an intake appointment, Ms. Odermatt requested a late-afternoon appointment, which Mount Sinai failed to provide.

8.     On September 22, 2023, Ms. Odermatt sent an email to Mount Sinai, again requesting late-afternoon appointments as an accommodation for her DSPS and additional accommodations for her ADHD.

9.     Ms. Odermatt repeatedly requested late-afternoon appointments and biweekly care, but the Mount Sinai Clinic medical team repeatedly and consistently dismissed, rejected, or ignored her requests for these accommodations.

10.    On January 30, 2024, Mount Sinai stated in a letter addressed to Ms. Odermatt that her request for biweekly care was "not an appropriate ADA reasonable accommodation request."

11.    Ms. Odermatt is entitled to equal access to services offered by Mount Sinai as are enjoyed by non-disabled persons or persons with different disabilities.

12.    Under federal regulation, which authoritatively construes the associated statutes, a covered entity is required to "make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such . . . services . . . or accommodations to individuals with disabilities." 42 U.S.C. § 12182(b)(2)(A)(ii); 45 C.F.R. § 84.4(b)(iii).

13.    State law follows suit, and city law provides even broader protections. For example,

Mount Sinai's failure to accommodate Ms. Odermatt's request for late-afternoon appointments violated city law simply because Ms. Odermatt's "disability [wa]s known or should have been known" by Mount Sinai. N.Y.C. Admin. Code § 8-107(15)(a). Under city law, every accommodation is "reasonable" as long as it "does not cause undue hardship in the conduct of the covered entity's business," and "[t]he covered entity has the burden of proving undue hardship." N.Y.C. Admin. Code § 8-102.

14.    Mount Sinai discriminated against Ms. Odermatt by refusing to accommodate the scheduling requests she required to safely and fully participate in her health care.

15.    Mount Sinai subsequently retaliated by discharging Ms. Odermatt on the basis that she opposed Mount Sinai's discriminatory practices.

16.    Mount Sinai's revocation of its expressed accommodation of Ms. Odermatt's ADHD (i.e., biweekly medication management appointments) and its expressed and practical denial of alternate accommodations (e.g., MyChart messaging) prevented her from enjoying the same service that a person without ADHD would enjoy.

17.    Mount Sinai's failure to honor Ms. Odermatt's request for late-afternoon appointments to accommodate her DSPS prevented her from enjoying the same service that a person without DSPS would enjoy.

18.    Mount Sinai's discrimination against Ms. Odermatt caused her to suffer anger, exhaustion, humiliation, frustration, and emotional distress. Indeed, civil rights violations are inherently distressing because they inflict a profound, personal humiliation and reinvoke a history of exclusion. Mount Sinai has made it harder for Ms. Odermatt to live healthfully and authentically in a life with DSPS and ADHD.

19.    Ms. Odermatt brings this action seeking nominal, compensatory, and punitive

damages; declaratory, injunctive, and equitable relief; and attorney's fees and costs to redress Defendants' unlawful discrimination against her on the basis of his disability in violation of Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*; Title V of the Americans with Disabilities Act, 42 U.S.C. § 12203(a); Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), 42 U.S.C. § 18116; the New York Human State Rights Law ("NYSHRL"), Article 15 of the N.Y. Executive Law § 290 *et seq.*; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 *et seq.*

## PARTIES

20.     Plaintiff Emily Odermatt is a resident of Astoria, New York, who is substantially limited in the major life activities of sleeping, concentrating, and cognition. Therefore, she has a "disability" within the meaning of city, state, and federal civil rights law.

21.     Defendant Mount Sinai Health System, Inc., is the sole parent/member of Mount Sinai Hospitals Group, Inc., and both entities are not-for-profit corporations.

22.     Defendant Mount Sinai Hospitals Group, Inc., is the sole parent/member of The Mount Sinai Hospital.

23.     Defendant Mount Sinai Hospital is a not-for-profit corporation, and its mailing address is One Gustave L. Levy Place, New York, New York 10029.

24.     Upon information and belief, Mount Sinai is a place of public accommodation and a recipient of federal financial assistance.

25.     Medicare and Medicaid reimburse Mount Sinai for care that it provides to Medicare and Medicaid beneficiaries.

26.     Mount Sinai agreed to receive federal funds in exchange for promising to refrain

from discriminating against qualified individuals with disabilities, among other reasons.

27.     The federal government has substantially performed its obligations under this contractual arrangement with Mount Sinai, including reimbursements for Medicare and Medicaid, and was willing and able to perform its remaining obligations.

## JURISDICTION AND VENUE

28.     This Court has subject matter jurisdiction for the federal-law claims under 28 U.S.C. §§ 1331 and 1343 because this action arises under the laws of the United States. This Court also has supplemental jurisdiction for the city-law and state-law claims under 28 U.S.C. § 1367 because those claims are substantially related to the federal-law claims.

29.     Venue is proper in this District under 28 U.S.C. § 1391(b) because, among other things, Defendants reside in this District and the acts and omissions giving rise to this Complaint occurred in this District.

## STATEMENT OF FACTS

**I.      Ms. Odermatt requested late-afternoon appointments due to her Delayed Sleep Phase Syndrome.**

30.     Emily Odermatt has Delayed Sleep Phase Syndrome and Attention Deficit / Hyperactivity Disorder, among other disorders.

31.     DSPS is "a sleep disorder that affects the internal clock, known as circadian rhythm. People with this sleep disorder have sleep patterns that are delayed two hours or more from usual sleep patterns. They go to sleep later and wake later.[1] This makes it hard to wake in time for work." *Delayed Sleep Phase*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/delayed-

---

[1] "Sleep and wake times are delayed at least two hours and may be delayed up to 3 to 6 hours. People with delayed sleep phase may regularly go to sleep at 3 a.m. and wake at 10 a.m., for example." *Delayed Sleep Phase*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/delayed-sleep-phase/symptoms-causes/syc-20353340 (last visited July 1, 2024).

sleep-phase/symptoms-causes/syc-20353340 (last visited July 1, 2024).

32.     According to the Mayo Clinic, DSPS symptoms are persistent: "[t]hey last at least three months and often for years." Symptoms of DSPS include insomnia, trouble waking up in the morning, extreme daytime drowsiness, and trouble staying alert during the day. *Id.*

33.     According to Stephen Stahl, et. al., DSPS "is the most common [form] of the circadian rhythm disorders," which presents as a difficulty maintaining a normal sleep/wake schedule within a typical 24-hour schedule. Individuals with DSPS "are unable to fall asleep until early morning hours and awaken in the late morning/early afternoon" and delayed sleep phase disorder "has been associated with polymorphisms in the CLOCK gene."[2]

34.     Because of DSPS, Ms. Odermatt is unable to fall asleep until early-morning hours and wake up in the late morning or early afternoon. The shift in the sleep/wake schedule interferes with her daily functioning, such as the scheduling of appointments with Mount Sinai and other businesses that operate during daytime hours.

35.     In September 2023, Ms. Odermatt was taken from the Mount Sinai clinic's waitlist and invited for an intake appointment in person at the Mount Sinai Clinic.

36.     Throughout her treatment, Ms. Odermatt's doctor was a third-year psychiatry resident named Dr. Laura Isabella Van Dyck. Dr. Van Dyck's supervisor is the psychiatry residency director, Dr. Antonia New. The clinic leader who oversees the ambulatory practice on Fifth Avenue  is named Dr. Nitin Toteja. All three are medical doctors licensed in the state of New York and specialized in the field of psychiatry.

37.     Ms. Odermatt asked Mount Sinai's administrative and social work team for

---

[2]  Stahl, S.M., Morrissette, D.A. and Muntner, N., *Assessment of Sleep/Wake Disorders*, Sleep and Wake Disorders (2016), at pp. 66-69.

accommodations related to her DSPS and ADHD when she was going through the intake process.

38.     On September 22, 2023, Ms. Odermatt emailed Mount Sinai (MSHPATIENTRELATIONS@mountsinai.org) to reiterate an earlier request that "all of [her] clinic appointments to take place in the afternoon (defined roughly as after 2:30 PM, if telehealth, or 3:00 PM, if in-person)."

39.     Ms. Odermatt's email was acknowledged by Patient Relations representative Elsie Valentin twice on September 25, 2023.

40.     Despite Ms. Odermatt's requests for accommodations, Ms. Odermatt was told that intake appointments must begin no later than 2:00 PM by staff at the Mount Sinai Clinic.

41.     Ms. Odermatt arrived for patient registration and to attend her in-person intake appointment with psychiatrist Dr. Laura Van Dyck on September 26, 2023 at 2:00 PM.

42.     During this intake appointment, Ms. Odermatt provided multiple documents evidencing her DSPS diagnosis to two Mount Sinai psychiatrists, namely Dr. Van Dyck and an attending doctor named Dr. Frederick Limson.

43.     Ms. Odermatt provided Dr. Van Dyck and Dr. Limson with her diagnostic history, prior health records, and sleep study results. The sleep study advised them that her sleep activity took place in the hours of the late morning (6:19 AM to 2:00 PM).

44.     Ms. Odermatt also provided Dr. Van Dyck with a paper copy of the report that resulted from her psychological evaluation, which contained her historical and present diagnoses.

45.     In addition to the physical documents exchanged during intake, Ms. Odermatt sent Dr. Van Dyck several emails prior to intake in which medical records from some of Ms. Odermatt's prior physical and mental health care providers were attached and in which her history of prior psychiatric disorders and symptoms were documented. Dr. Van Dyck documented these

diagnoses, and receipt of the health records that Ms. Odermatt provided, in her intake appointment notes on September 26, 2023.

46.    Given Ms. Odermatt's emails to Mount Sinai and its Patient Relations department, as well as Ms. Odermatt's shared diagnostic history, prior health records, and sleep study results, Mount Sinai had knowledge or should have knowledge of Ms. Odermatt's disability and thus need for accommodations.

47.    Despite Ms. Odermatt's request on September 22, 2023 and presentation of her sleep study report four days later, among other things, Mount Sinai failed to honor Ms. Odermatt's request about 50% of the time—namely, her requested appointment time of 2:30 PM or later.

48.    Following her intake appointment and assignment to Dr. Van Dyck, Ms. Odermatt attempted to secure the accommodation with Dr. Van Dyck directly.

49.    Upon information and belief, Dr. Van Dyck was responsible for scheduling the days and times of all follow-up appointments (i.e., all appointments other than her intake).

50.    When scheduling every follow-up appointment, Ms. Odermatt attempted to select the latest afternoon appointment that was available on Dr. Van Dyck's schedule.

51.    Mount Sinai failed to accommodate Ms. Odermatt with a late afternoon appointment on September 26, 2023.

52.    As noted in Ms. Odermatt's email dated September 22, 2023, she "requested the latest possible appointment that the clinic offers; [she] was told if [she] waited several weeks, [she] could have the appointment that occurred at the latest possible time-of-day, which was 2:30 PM. Figuring that an intake appointment would be a one-off event, [she] booked the 2:30 PM appointment on September 26, 2023, and resigned [herself] to some sleep debt."

53.    By email, Ms. Odermatt was instructed to arrive to her intake one half-hour before

the scheduled time: "Arrival time: 2 pm – registration." The 2:30 PM time might have been when she would meet with the doctor, but her attendance was required—in-person—starting at 2:00 PM.

54.     Mount Sinai failed to accommodate Ms. Odermatt with an afternoon appointment on October 17, 2023.

55.     For this appointment on October 17, 2023, there is no indication why Dr. Van Dyck was not available during the requested parameters.

56.     Mount Sinai failed to accommodate Ms. Odermatt with an afternoon appointment on November 22, 2023.

57.     For this appointment on November 22, 2023, Dr. Van Dyck advised Ms. Odermatt that the clinic would have a half day (i.e., morning and early afternoon service) because Thanksgiving was the following day. Dr. Van Dyck also advised Ms. Odermatt that she wanted her to come to the clinic that week in person in order to complete an electrocardiogram, as Dr. Van Dyck had cardiovascular concerns related to Ms. Odermatt's recent initiation of a new medication.

58.     Had the clinic been open until its normal operating hours, which are usually until 7:00 PM on Wednesdays, or had Dr. Van Dyck selected another day during that week (e.g., Monday the 20th or Tuesday the 21st) for this appointment, Ms. Odermatt could have attended an appointment with an accommodated time in the late afternoon or evening. However, to comply with Mount Sinai's directives, Ms. Odermatt attended the appointment that Dr. Van Dyck offered to her, which was the early afternoon of Wednesday, November 22nd.

59.     Mount Sinai failed to accommodate Ms. Odermatt with an afternoon appointment on January 5, 2024.

60.     For this appointment on January 5, 2024, there is no indication why Dr. Van Dyck was not available during the requested parameters.

61.     Mount Sinai failed to accommodate Ms. Odermatt with an afternoon appointment on January 19, 2024.

62.     For this appointment on January 19, 2024, there is no indication why Dr. Van Dyck was not available during the requested parameters.

63.     Ms. Odermatt sent a message to Dr. Van Dyck on January 6, 2024 via MyChart, asking Dr. Van Dyck to move her appointment on January 19, 2024 to a later time and reminding her of the accommodation she previously requested in September 2023.

64.     Upon receiving this request, Dr. Van Dyck moved Ms. Odermatt's telehealth appointment on January 19, 2024, from the first time that she offered Ms. Odermatt, 1:00 PM,  to 2:00 PM, which was still not after Ms. Odermatt's requested appointment time of 2:30 PM or later.

65.     During her appointment with Dr. Van Dyck and her supervisor, Dr. Antonia New, on January 19, 2024, Ms. Odermatt again raised the issue of her DSPS on several occasions, including the impairments attributable thereto, which makes it difficult for her to attend appointments early in the day.

66.     Drs. Van Dyck and New chose not to specifically respond to this issue Ms. Odermatt raised, instead redirecting the conversation to their perspective that Ms. Odermatt was "complaining" about the accommodations in care that she was requesting and would not be receiving for her ADHD.

67.     When Ms. Odermatt escalated her accommodation request to Patient Relations, a person identifying himself as Ms. Valetin's supervisor called Ms. Odermatt on January 25, 2024.

68.     During that call, the Patient Relations supervisor informed Ms. Odermatt that Mount Sinai would not accommodate her request for a late-afternoon appointment because other patients might schedule appointments in the late afternoon.

**II.    Ms. Odermatt requested appointments twice per month as an accommodation for her Attention-Deficit/Hyperactivity Disorder.**

69.    At the end of her intake appointment on September 26, 2023, when Ms. Odermatt and Dr. Van Dyck were completing the treatment plan, Ms. Odermatt verbally requested biweekly care to accommodate her ADHD.

70.    The Plan of Care that Ms. Odermatt and Dr. Van Dyck completed on September 26, 2023 stated that Ms. Odermatt would receive medication management appointments twice monthly until September 2024.

71.    Between intake in September 2023 and their final appointments in January 2024, Dr. Van Dyck met with Ms. Odermatt two times per month.

72.    In between Ms. Odermatt's appointments on January 5, 2024 and January 19, 2024, Dr. Van Dyck called Ms. Odermatt on the phone and indicated that she would no longer be seen on a biweekly basis.

73.    Ms. Odermatt voiced her objections to this change during the call and during her next appointment on January 19, 2024, with Drs. Van Dyck and New present. Specifically, Ms. Odermatt objected on the grounds that they were obligated to accommodate patients with disabilities.

74.    In reply to her objection, Dr. New told Ms. Odermatt that this was a mistake and that Mount Sinai is "required to accommodate people with disabilities when they are employees; our judgment about psychiatric care is a clinical judgment. . . . The model of our clinic is monthly treatment. . . . We are not obligated to treat you more than monthly for medication management."

75.    Dr. New also stated: "I'm not sure we can meet your needs, Ms. Odermatt! . . . I think what Dr. Toteja said to you is probably right, which is that we probably cannot accommodate you in our clinic to do that, to meet that need."

76.     When Ms. Odermatt replied by asking why Mount Sinai would not accommodate her at this place of public accommodation, Dr. New told her, "We don't have that model of treatment in our clinic."

77.     Ms. Odermatt pointed out to Dr. New that the Mount Sinai Clinic already offered that model of treatment; that is, biweekly appointments with Dr. Van Dyck in the prior months of treatment.

78.     Ms. Odermatt also replied to Dr. New by saying that she was "open to having a dialogue" and even suggested other alternatives to biweekly frequency of appointments, such as written communication.

79.     Following her appointment on January 19, 2024, Ms. Odermatt sent an emailed complaint to the Mount Sinai Compliance and Patient Relations email addresses, in which Ms. Odermatt reported what Dr. New told her during their conversation about her accommodations requests.

80.     Mount Sinai cancelled Ms. Odermatt's next appointment, which was supposed to take place about two weeks after her appointment with Drs. New and Van Dyck.  Had the appointment taken place, it would have happened on January 29, 2024 at 5:00 PM

## III.    Mount Sinai discharged Ms. Odermatt in unlawful retaliation of her exercising her rights under city, state, and federal law and advocating for her rights under the New York State Patients' Bill of Rights

81.     Mount Sinai unlawfully retaliated against Ms. Odermatt when Drs. Van Dyck and Toteja discharged Ms. Odermatt from the Mount Sinai ambulatory psychiatry clinic because she refused to sign a document known as a Behavior Plan. Ms. Odermatt sent a written opposition to Mount Sinai's Behavior Plan on January 30, 2024, in which she explained that her refusal to sign the Plan was on the grounds that it failed to acknowledge her right to accommodation by treating

it as optional (or otherwise ignoring it in the case of the biweekly care) and elaborated upon the discriminatory impact. What is more, Ms. Odermatt made complaints to the relevant governmental authorities once Mount Sinai's senior leadership team refused to adequately intervene, and these complaints are speech protected from retaliation, including discharge, under several laws, including the NYCHRL.

82.    On January 26, 2024, Ms. Odermatt filed a complaint with the New York State Department of Health, stating in part:

> "I am writing a complaint because I have concerns that my rights as a patient, especially those codified in the New York State Patients' Bill of Rights and my right to disability accommodations, are being violated.... I'm scared that the clinic is going to terminate me and my doctor because I asked for accommodations and for complaining when the senior leaders denied that I had a right to them. The fact that Dr. Toteja cancelled my appointment shows they're already taking adverse action against me. They've also repeatedly called me on my cell phone, even though my emailed complaints to Patient Relations and/or Compliance have all said that email was the only authorized method of communication. I feel harassed. I want to be able to see my doctor, with the accommodations that I asked for and that are justified by my disabilities. I want the Department of Health to help me so that I don't have to file with the federal, state, or local government about disability discrimination or go to court/sue them (e.g., under the ADA) so that I can enjoy accommodated care."

83.    Ms. Odermatt filed this complaint because of the non-response she was experiencing from Mount Sinai regarding her accommodation requests, i.e., appealing the decisions of Dr. Toteja, Dr. New, and Patient Relations not to accommodate her DSPS and ADHD.

84.    At around the same time, Ms. Odermatt filed a similar report of discrimination on the website of the New York City Commission on Human Rights

85.    In response to Ms. Odermatt's communication, on January 30, 2024, Mount Sinai stated in a letter that Ms. Odermatt's request for biweekly appointments with her psychiatrist was "not an appropriate ADA reasonable accommodation request."

86.     Mount Sinai must honor New York State Patients' Bill of Rights.

87.     Enshrined in the New York State Patients' Bill of Rights is a requirement of informed consent. A patient has the right to receive "all the information that [the patient] need[s] to give informed consent for any proposed procedure or treatment. This information shall include the possible risks and benefits of the procedure or treatment."

88.     On February 7, 2024, Nicole Saylors of Mount Sinai emailed Ms. Odermatt advising her to sign a Behavior Plan, attached to the email: "we will need your understanding of these guidelines in order to continue a productive and therapeutic relationship."

89.     One of the reasons for Ms. Odermatt's biweekly accommodations was ensuring that she and her doctor had enough time for fully informed consent, as she is entitled to "all the information that [she] need[s]" and help understanding in order to make medical decisions consistent with the New York State Hospital Patients' Bill of Rights.

90.     Ms. Odermatt tried in vain to explain this connection between the frequency of care as an accommodation for her ADHD and her civil rights when describing her refusal to sign the Behavior Plan.

91.     Ms. Odermatt was treated differently than patients who have their rights under the New York State Patients' Bill of Rights honored—namely, informed consent.

92.     Throughout the course of this issue (i.e., about January 8, 2024 to February 9, 2024), Ms. Odermatt spoke to and/or emailed Dr. Nitin Toteja, Dr. Antonia New, Mount Sinai Hospital Patient Relations, and the Mount Sinai Compliance and Legal teams, including an attorney named Mr. Schenkel.

93.     Despite Ms. Odermatt's repeated requests, Mount Sinai failed to accommodate her ADHD in favor of discharging her from care.

94.     Ms. Odermatt was deprived of the full and equal enjoyment of Mount Sinai's benefits and services. Specifically, she did not receive a "like experience" as compared to non-disabled patients who receive full benefits and services from Mount Sinai, or patients whose disabilities do not interfere with enjoyment of their rights and care.

95.     Accordingly, Ms. Odermatt, as a person seeking medical treatment, had an expectation interest in the ability to fully participate in her own medical care, healthcare decisions, and all of the benefits and services provided by Mount Sinai, including but not limited to appointment times and frequencies that account for her DSPS and ADHD.

96.     Mount Sinai must reinstate Ms. Odermatt's care.

97.     When Ms. Odermatt was scheduled for intake, she received from the clinic a packet containing a booklet called *Your Rights as a Hospital Patient in New York State.*

98.     In addition, Ms. Odermatt received the same booklet as a PDF from the clinic via email attachment, dated 2:25 PM on September 25, 2023.

99.     Contained in this booklet is the *Patients' Bill of Rights in a Hospital,* which is cited in a footnote on page 13 of the booklet as "Public Health Law(PHL)2803 (1)(g) Patient's Rights, 10 NYCRR, 405.7(a)(1), 405.7(c)".

100.    Among the enumerated rights contained on page 13 is that "As a patient in a hospital in New York State, you have the right, consistent with law, to: . . . (1) Understand and use these rights.  If for any reason you do not understand or you need help, the hospital MUST provide assistance . . . (2) Receive treatment without discrimination as to . . . disability, . . . (8) Receive complete information about your diagnosis, treatment and prognosis.  (9) Receive all information that you need to give informed consent for any proposed . . . treatment. This information shall include the potential risks and benefits of the . . . treatment. . . . (14) Participate in all decisions

about your treatment . . . (19) Complain without fear of reprisals about the care and services you are receiving . . . ."

101.    A similar bill of rights was also published on the wall of the waiting room at the clinic's physical address, 1160 Fifth Avenue, Basement Suite, which Ms. Odermatt saw when attended in-person appointments (e.g., September 26, 2023).

102.    Prior to intake with Dr. Van Dyck or at the clinic, Ms. Odermatt read the PDF version of the Bill of Rights.

103.    During intake on September 26, 2023, Ms. Odermatt signed two documents indicating her receipt of this booklet; a document called the *Proxy Questionnaire and Acknowledgement Statement* and a document called the *Mount Sinai Medical Center Ambulatory Psychiatry Services Patient Acknowledgement*, wherein Ms. Odermatt signed to the following statement: *I have received a copy of the patient "Bill of Rights" which describes my rights and privileges as an individual receiving this treatment*; Ms. Odermatt provided both of these signed documents to clinic staff during the registration portion of her intake appointment on September 26, 2023.

104.    Based on the foregoing wall display, email, physical packet, and the required signature on the two documents, Ms. Odermatt had an expectation that she would enjoy the enumerated rights that were articulated therein.

105.    In mid-December 2023, Ms. Odermatt anticipated that her psychiatric medication regimen would likely change within one month's time.

106.    In an attempt to solicit a complete and accurate conversation with Dr. Van Dyck regarding any upcoming treatment options, but especially medication changes (including substitutions and augmentation), Ms. Odermatt began an informed consent discussion with Dr.

Van Dyck during their December 18, 2023 appointment.

107.    Ms. Odermatt and Dr. Van Dyck met again on January 5, 2024, and the topic of medication changes came up again, including stopping a medication Ms. Odermatt was taking, replacing the medication that Dr. Van Dyck was prescribing her with a different medication in the same class, and augmenting the medication that Ms. Odermatt was taking with an additional medication from a different class.

108.    Throughout the course of the appointment on January 5, 2024, Ms. Odermatt repeatedly attempted to elicit detailed information about each of the medication recommendations that Dr. Van Dyck was proposing, including an explanation of Dr. Van Dyck's "logic," the characteristics, risks, and possible benefits of the medications proposed, and alternatives to Dr. Van Dyck's preferred recommendations.

109.    At the conclusion of their time, Dr. Van Dyck proposed a "diagnostic impression" that Ms. Odermatt had a personality disorder and described her impression that this personality disorder compelled Ms. Odermatt to "control" her psychiatric care and impaired her functioning. Dr. Van Dyck made reference to Ms. Odermatt's attempts to understand why Dr. Van Dyck selected specific medication formulations during their conversation, (i.e., the timing of the medication) to explain her diagnostic impression about Ms. Odermatt's impaired personality functioning.

110.    After their January 5, 2024 appointment, Dr. Van Dyck documented in Ms. Odermatt's medical record that Ms. Odermatt said that she "did not feel 'adequately informed,'" about Dr. Van Dyck's recommendation. Despite directly quoting Ms. Odermatt, Dr. Van Dyck concluded that Ms. Odermatt had "expressed disagreement" with her treatment suggestions.

111.    As a result of feeling inadequately informed, Ms. Odermatt sought an appointment

with a different Mount Sinai psychiatrist for psychopharmacological education about Dr. Van Dyck's medication recommendations, which she called a "second opinion" appointment.

112.    During the week of January 8, 2024, Ms. Odermatt spoke to the ambulatory psychiatry director, Dr.  Toteja, by telephone, during which she complained about how she felt that she was not being fully informed about each of Dr. Van Dyck's recommendations when they spoke during their appointments. As such, Ms. Odermatt said she wanted a "second opinion" appointment with another doctor to understand the recommendations.

113.    Dr. Toteja rejected Ms. Odermatt's "second opinion" appointment request, indicating that another doctor would not schedule a "second opinion" appointment to explain Dr. Van Dyck's recommended treatments to Ms. Odermatt.  Dr. Toteja also told Ms. Odermatt to seek accommodation at a different practice if she needed accommodation.

114.    Ms. Odermatt indicated that she had a right to accommodation at the 1160 Fifth Avenue clinic as a person with a disability, and thus refused to be referred to another provider based on her need for accommodation.

115.    In reply, Dr. Toteja indicated that the other patients at the clinic had disabilities and continued to refuse Ms. Odermatt any accommodation. Due to his specific refusal to discuss accommodation at his clinic, Ms. Odermatt indicated that she would report Dr. Toteja to the New York City Commission on Human Rights.

116.    Ms. Odermatt subsequently documented this conversation, and her complaint, to the Mount Sinai senior leadership team and in a report of discrimination that she submitted online to the New York City Commission on Human Rights and by phone to the state.

117.    No Mount Sinai senior leadership team member responded to Ms. Odermatt's email about Dr. Toteja's remarks.

118.    Based on Dr. Toteja's explanation about "second opinion" appointments, Ms. Odermatt inferred that only the psychiatrist recommending a given treatment would be responsible for explaining their recommendation to the patient; here, Dr. Van Dyck would be responsible to explain her recommendations to Ms. Odermatt in order to get informed consent.

119.    In order to seek a more detailed explanation for Dr. Van Dyck's recommendations, Ms. Odermatt sent messages to Dr. Van Dyck through the Mount Sinai MyChart portal, in which Ms. Odermatt enumerated specific things she did not understand about Dr. Van Dyck's treatment recommendations as well as questions to answer which would provide the needed understanding of the treatment recommendations.

120.    Dr. Van Dyck did not write Ms. Odermatt back in response to any of these questions.

121.    During Ms. Odermatt's final appointment on January 19, 2024, Ms. Odermatt began the appointment by soliciting discussion of these questions and their answers.

122.    Drs. Van Dyck and New purposefully did not dedicate any time to Ms. Odermatt's medication questions during their January 19, 2024 appointment.

123.    When Ms. Odermatt solicited continued biweekly care with Dr. Van Dyck during the period in which Dr. Van Dyck and Ms. Odermatt would be discussing proposed changes to Ms. Odermatt's medication regimen, Dr. New indicated that the clinic's practice was "monthly medication management" and discussed that the clinic offered short-term psychotherapy with a social worker.

124.    Ms. Odermatt replied to Dr. New by indicating that she was continually seeking a long-term psychotherapy provider outside of the clinic to accomplish an adequate dose of therapy, to treat her comorbid (complex) post-traumatic stress disorder. Ms. Odermatt noted that such

psychotherapeutic care would be separate from accommodations that she should receive in the course of medication management discussions that were the focus of psychiatric care, including alternates to the biweekly appointments with her doctor that she had been enjoying, like written communication via MyChart message.

125.    Dr. New repeatedly refused to discuss accommodations for care with Dr. Van Dyck at the clinic, citing the clinic's monthly medication management policy. Dr. Van Dyck remained mostly silent during the conversation between Dr. New and Ms. Odermatt unless specifically invited by Dr. New to speak

126.    When Ms. Odermatt pointed out to Dr. New that Dr. Van Dyck had already been meeting with her on about a biweekly basis, thus showing that the clinic was already able to accommodate a biweekly frequency of care between herself and Dr. Van Dyck, Dr. New explained that this happened because the clinic saw patients more frequently when there were ongoing diagnostic considerations and for an extended intake, which Dr. New alleged Ms. Odermatt underwent.

127.    Especially since Dr. Van Dyck had introduced her most recent "diagnostic impression" of Ms. Odermatt (i.e., the personality disorder) at the end of their January 5th appointment, which was exactly two weeks prior to Dr. New's articulation of the two exceptions to the clinic's policy of monthly medication management appointments, Ms. Odermatt was still subject to the scrutiny of an ongoing diagnostic evaluation by Dr. Van Dyck in January 2024. This incomplete conversation regarding Ms. Odermatt's alleged personality dysfunction was taking place in addition to the incomplete informed-consent conversations that Ms. Odermatt underwent regarding Dr. Van Dyck's recommendations to change Ms. Odermatt's medication(s).

128.    Therefore, for the reason Dr. New articulated, Ms. Odermatt was still eligible for

more frequent psychiatric appointments than the clinic's general monthly medication management policy, to which Dr. New was pointing in order to justify that she and Dr. Van Dyck were proposing a decrease in the frequency of Ms. Odermatt's psychiatric care.

129.    Following Ms. Odermatt's appointment with Drs. New and Van Dyck, Ms. Odermatt again solicited help with securing accommodations from hospital senior leadership and complained in writing about Dr. New's failure to discuss disability accommodations, citing the New York City Commission on Human Rights law and published legal guidelines.

130.    In response, Mount Sinai mailed Ms. Odermatt a letter, dated January 30, 2024, indicating that biweekly appointments were not an ADA accommodation, that Ms. Odermatt was offered psychotherapy at the clinic, and that Ms. Odermatt could use MyChart to communicate with her doctor.

131.    The Director of Service Excellence subsequently sent Ms. Odermatt an email wherein she and Dr. Toteja required that Ms. Odermatt sign a Behavior Plan: "we will need your understanding of these guidelines in order to continue a productive and therapeutic relationship."

132.    Mount Sinai conditioned further psychiatric care on Ms. Odermatt agreeing to this Behavior Plan; immediately above the Patient signature box, the Behavior Plan stated that "failure to meet these expectations may result in the immediate termination of the relationship between the outpatient Psychiatry practice and me."

133.    In the Behavior Plan, Mount Sinai indicated that Ms. Odermatt should expect that the clinic would try to accommodate her DSPS, but they did not guarantee this accommodation: "The practice will do its best to accommodate appointments within their practice regularly scheduled hours."

134.    It also articulated the expectation that "[p]atients should . . . not use bad or abusive

language or behavior and stated "you cannot direct care."

135.    Ms. Odermatt immediately refused to sign the plan, stating so plainly and explaining why she would not sign in a reply email, including: the right to oppose discriminatory practices and related legal action that could be construed by the practice as "bad or abusive language;" the right to accommodations for her disabilities, including late appointment times; and the right to "direct care" by withholding agreement to pursue a given treatment recommendation until Dr. Van Dyck, or any other psychiatrist, provided Ms. Odermatt fully-informed consent.

136.    Without replying to Ms. Odermatt's email, Mount Sinai discharged Ms. Odermatt from care with no prior notice; Ms. Odermatt was notified of her termination by receiving a text message from the MyChart messaging system, which indicated when Drs. Toteja and Van Dyck published discharge "visits" to her Mount Sinai account.

137.    Dr. Toteja documented Ms. Odermatt's request for a "second opinion" in her discharge note, dated February 9, 2024.

138.    Dr. Toteja falsely documented that he communicated to Ms. Odermatt within the Behavior Plan that she would be transferred from the care of residents (i.e., Dr. Van Dyck) to an attending doctor in his discharge note.  No such text is in the Behavior Plan or the email in which the Behavior Plan was sent.

139.    Dr. Toteja also falsely documented that Ms. Odermatt received referrals for care upon discharge. In a separate discharge note, Dr. Van Dyck also falsely documented that Ms. Odermatt received referrals for care. No referrals were included in either of the discharge notes dated February 9, 2024 or in any other record on MyChart or as provided to Ms. Odermatt in response to a HIPAA request for her medical records.

140.    Dr. Van Dyck also documented in her discharge note that the basis for this

discharge was Ms. Odermatt's refusal to sign the Behavioral Plan: "The patient was offered a behavior plan ... She refused to sign the agreement and therefore was discharged from the clinic."

141.    By opposing the Behavior Plan on discriminatory grounds, Ms. Odermatt engaged in protected activity: opposing discriminatory behavior, including failure to accommodate patients in the care of the clinic and acknowledge the rights to accommodations that patients have as clinic patients.

142.    By documenting that Ms. Odermatt was discharged for failure to sign the Behavior Plan, the clinic and, in particular, Dr. Van Dyck documented that they were aware of Ms. Odermatt's opposition and this was the causal basis for the adverse action of discharging Ms. Odermatt from care with no notice. Specifically, the causation between the refusal and the discharge is documented where Dr. Van Dyck wrote: "She refused to sign the agreement and **therefore** was discharged from the clinic." (emphasis added)

143.    Dr. Toteja also documented transmission of the Behavior Plan and acknowledged receipt of Ms. Odermatt's emailed refusal to sign the Behavior Plan in his discharge note, in which he wrote: "A behavior plan outlining this offer with details of expectations around conduct, means of communication and expected frequency of appointments was emailed to the patient (as she declined to meet to discuss this with a clinician). She declined to sign this letter and was discharged from the clinic…"

144.    The causal statement in Dr. Van Dyck's discharge note, the correlative statement in Dr. Toteja's note, and the legally protected objections to discriminatory conduct and expression made in Ms. Odermatt's emailed refusal to sign the Behavior Plan, are sufficient to demonstrate a prima facie claim for retaliation.

145.    In addition, the content of the Behavior Plan constitutes evidence for intentional,

unlawfully discriminatory policies articulated on behalf of defendants by the Director of Service Excellence.

146.    The failure of the defendants to reply to Ms. Odermatt's emailed opposition to the Behavior Plan, to disclaim any discriminatory interpretation, constitutes deliberate indifference.

147.    Mount Sinai's staff knew that it was not effectively accommodating Ms. Odermatt with the methods they were using and therefore acted with deliberate indifference to her federally protected rights.

148.     Likewise, Mount Sinai's staff knew that Ms. Odermatt would not receive equal participation on this same basis.

149.    Mount Sinai discharged Ms. Odermatt by publishing a note in her MyChart dated February 9, 2024, in which Dr. Toteja, as the Director of Ambulatory Psychiatry Services at The Mount Sinai Hospital, wrote that Ms. Odermatt "escalated concerns to clinic leadership saying she needs weekly or bi-weekly appointments with her resident psychiatrist as she has a disability from ADHD."

150.    Mount Sinai's discrimination against Ms. Odermatt not only caused emotional distress but violated her civil rights.

151.    As a result of Mount Sinai's failure to accommodate Ms. Odermatt, she received services that were objectively substandard and that were inferior to those provided to patients who received the full panoply of their rights under the New York State Patients' Bill of Rights, the Americans with Disabilities Act, the New York City Human Rights Law, etc.    .

152.    In doing so, Mount Sinai intentionally discriminated against Ms. Odermatt and acted with deliberate indifference to her civil rights.

153.    Mount Sinai intentionally and deliberately discriminated against Ms. Odermatt by

denying her the opportunity for the full and equal enjoyment of its programs, services and activities.

154.    Mount Sinai intentionally and deliberately discriminated against Ms. Odermatt by denying her the opportunity to participate in and benefit from its programs, services and activities.

155.    Mount Sinai intentionally and deliberately discriminated against Ms. Odermatt by offering or affording her services that are not equal to those services afforded to other individuals who received the full panoply of their rights under the New York State Patients' Bill of Rights, the Americans with Disabilities Act, the New York City Human Rights Law, etc.    .

156.    Mount Sinai intentionally and deliberately discriminated against Ms. Odermatt by failing to make reasonable modifications in policies, practices, or procedures.

157.    Mount Sinai continues to harm Ms. Odermatt, who is willing to resume mental health care at the clinic services given her history and access to medical records along with her geographical proximity. Other outpatient or ambulatory psychiatric programs, for instance, do not accept her insurance, offer late afternoon and evening hours, take certain cases, or have available the necessary psychiatry providers.

158.    On or about April 10, 2024, the social worker from Ms. Odermatt's primary care clinic, Weill Cornell Internal Medicine Associates, gave Ms. Odermatt the phone number to speak to the intake team at the Mount Sinai Beth Israel psychiatry clinic, in an attempt to identify local psychiatric clinics at which Ms. Odermatt could resume care.

159.    Even though Ms. Odermatt has already been a Mount Sinai ambulatory psychiatry patient, and Mount Sinai medical records are shared amongst their campuses, she was asked to do an in-person intake appointment at the Mount Sinai Beth Israel psychiatry clinic. The intake employee indicated that the Mount Sinai Beth Israel psychiatry clinic schedules intakes between

1:00 and 3:00 PM and sometimes in the morning. Ms. Odermatt asked for an accommodation for her DSPS, either to do the intake via telehealth in that time frame (e.g., 2:30 PM) or to come in-person to the Beth Israel clinic later in the day.

160.    Mount Sinai Beth Israel refused Ms. Odermatt's request for an accommodation and said it is against their policy.

161.    Ms. Odermatt confirmed Mount Sinai Beth Israel is open later than 3:00 PM; James Anderson, the Director of the Intake Center, said they are generally open until 6:00 PM, but only for non-intake appointments. He also claimed that insurance will not allow them to do tele-health intakes at their clinic—while refusing to explain why. Ms. Odermatt also asked for alternate accommodations, including breaking up the intake over several days—to no avail.

CAUSES OF ACTION

**CLAIM I:        Violations of Title III of the Americans with Disabilities Act**

162.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges them in support of this claim

163.    At all times relevant to this action, Title III of the Americans with Disabilities Act, 42 U.S.C. § 12181 *et seq.*, has been in full force and effect and has applied to Defendants' conduct.

164.    At all times relevant to this action, Ms. Odermatt has been substantially limited in the major life activities of sleeping, concentrating, and cognition and thus has a disability within the meaning of the ADA. 42 U.S.C. § 12102(2).

165.    Defendants own, lease, or operate a place of public accommodation within the meaning of Title III of the ADA. 42 U.S.C. § 12181(7)(F).

166.    Title III of the ADA provides that no "individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges,

26

advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

167.    Title III of the ADA defines discrimination to include "a failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations." 42 U.S.C. § 12182(b)(2)(A)(ii).

168.    Under Title III of the ADA, "[i]t shall be discriminatory to afford an individual or class of individuals, on the basis of a disability or disabilities of such individual or class, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals." 42 U.S.C. § 12182(b)(1)(A).

169.    Under Title III of the ADA, "[i]t shall be discriminatory to exclude or otherwise deny equal goods, services, facilities, privileges, advantages, accommodations, or other opportunities to an individual or entity because of the known disability of an individual with whom the individual or entity is known to have a relationship or association." 42 U.S.C. § 12182(b)(1)(E).

170.    Defendants discriminated against Ms. Odermatt on the basis of her disability in violation of Title III of the ADA and its implementing regulations.

171.    Under Title III of the ADA, Mount Sinai "fail[ed] to make reasonable modifications in policies, practices, or procedures" when it did not accommodate Ms. Odermatt's request for late-afternoon appointments. 42 U.S.C. § 12182(b)(2)(A)(ii).

172.    Under Title III of the ADA, Mount Sinai "fail[ed] to make reasonable modifications

in policies, practices, or procedures" when it did not accommodate Ms. Odermatt's request for continued biweekly appointments because of its general monthly medication management appointments policy. 42 U.S.C. § 12182(b)(2)(A)(ii).

173.    Defendants have failed to implement policies, procedures, and training of staff (e.g., doctors) necessary to ensure compliance with Title III of the ADA and its implementing regulations.

174.    Under Title III of the ADA, Mount Sinai should ensure that providers like Dr. New are aware that patients with disabilities, including Ms. Odermatt, are not making a "mistake" when they assert a right to accommodations, and that providers are required to reasonably accommodate patients' disabilities.

175.    Ms. Odermatt is entitled to injunctive relief and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)–(2); 42 U.S.C. § 2000a-3.

### CLAIM II:    Violations of Title V of the Americans with Disabilities Act

176.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges them in support of this claim.

177.    At all times relevant to this action, Title V of the ADA, 42 U.S.C. § 12203(a) has been in full force and effect and has applied to Defendants' conduct.

178.    Title V of the ADA prohibits retaliation against an individual because that person has "opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a).

179.    Title V makes available the remedies and procedures that are found in other titles of the ADA. 42 U.S.C. § 12203(c).

180.    There is a direct causative admission between Ms. Odermatt's discharge and her opposition to discriminatory behavior, such as a failure to accommodate, in the Behavior Plan. Ms. Odermatt required Mount Sinai's cooperation to meet her accommodation needs, as she was unable to self-schedule appointments with Dr. Van Dyck or to complete an informed-consent conversation about Dr. Van Dyck's medication recommendations alone.

181.    Defendants have failed to implement policies, procedures, and training of staff (e.g., doctors) necessary to ensure compliance with Title III of the ADA and its implementing regulations.

182.    Ms. Odermatt is entitled to injunctive relief and an award of attorney's fees, costs, and disbursements under the ADA. 42 U.S.C. § 12188(a)(1)–(2); 42 U.S.C. § 2000a-3.

**CLAIM III:    Violations of Section 504 of the Rehabilitation Act**

183.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges them in support of this claim.

184.    At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendants' conduct.

185.    At all times relevant to this action, Ms. Odermatt has been substantially limited in the major life activities of sleeping, concentrating, and cognition and thus has been an individual with a disability within the meaning of the Rehabilitation Act. 29 U.S.C. § 705(9); 29 U.S.C. § 705(20)(B); 42 U.S.C. § 12102(2).

186.    At all times relevant to this action, Defendants have been a program or activity receiving federal financial assistance under 29 U.S.C. § 794(b).

187.    Section 504 of the Rehabilitation Act provides that no "otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the

participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

188.    Under the Rehabilitation Act, federal regulations define discriminatory actions to include "[a]fford[ing] a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others." 45 C.F.R. § 84.4(b)(1)(ii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

189.    Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from "otherwise limiting a qualified handicapped person in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others receiving an aid, benefit, or service." 45 C.F.R. § 84.4 (b)(1)(vii). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

190.    Under the Rehabilitation Act, federal regulations prohibit recipients of federal funds from "[a]fford[ing] a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered nonhandicapped persons." 45 C.F.R. § 84.52(a)(2). This regulation authoritatively construes the Rehabilitation Act and was violated by Defendants.

191.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the Rehabilitation Act and its implementing regulations.

192.    Ms. Odermatt is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct under 29 U.S.C. § 794a.

193.    The Rehabilitation Act explicitly authorizes the remedies available under 42 U.S.C. § 1981a. Specifically, 29 U.S.C. § 794a(a)(2) provides that "[t]he remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection

(c)(3) of section 706 of such Act (42 U.S.C. 2000e–5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under section 794 of this title.

194.    Accordingly, 29 U.S.C. § 794a(a)(2) provides that anyone bringing claims of discrimination against a recipient of federal funding may avail themselves of the remedies in 42 U.S.C. § 2000(c)(e)(3), which in turn states: "*In addition to* any relief authorized by section 1981a of this title . . . an aggrieved person may obtain [other] relief . . . ." 42 U.S.C. § 2000e-5(e)(3)(B) (emphasis added). And 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

195.    As such, "*any person* aggrieved by *any act or failure to act by any recipient of Federal Assistance . . . under section 794*" is entitled to the "*remedies*, procedures, and rights" not only in "title VI of the Civil Rights Act of 1964," but also in "subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e–5)." 29 U.S.C. § 794a(a)(2) (emphasis added).

196.    42 U.S.C. § 2000e-5(e)(3), in turn, authorizes certain relief "[i]n addition to any relief authorized by section 1981a," and 42 U.S.C. § 1981a(b)(3) expressly permits compensatory damages for "emotional pain" and "mental anguish."

**CLAIM IV: Violations of the Patient Protection and Affordable Care Act**

197.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges them in support of this claim.

198.    At all times relevant to this action, Section 1557 of the ACA has been in full force and effect and has applied to Defendants' conduct.

199.    At all times relevant to this action, Ms. Odermatt has been substantially limited in the major life activities of sleeping, concentrating, and cognition and thus has been an individual

with a disability within the meaning of Section 1557 of the ACA, 42 U.S.C. § 18116.

200.    At all times relevant to this action, Defendants received federal financial assistance, including Medicare and Medicaid reimbursements, and have been principally engaged in the business of providing health care. Thus, Defendants are a health program or activity receiving federal financial assistance under 42 U.S.C. § 18116(a).

201.    Under Section 1557 of the ACA, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance." 42 U.S.C. § 18116.

202.    As set forth above, Defendants discriminated against Ms. Odermatt on the basis of her disability in violation of the ACA and its implementing regulations.

203.    The ACA, by incorporating the enforcement mechanism of the Rehabilitation Act, extends a cause of action to Plaintiff—that is, "any person aggrieved" by discrimination in violation of the Rehabilitation Act. 42 U.S.C. § 18116(a).

204.    Defendants have failed to implement policies, procedures, and training of staff necessary to ensure compliance with the ACA.

205.    Ms. Odermatt is entitled to injunctive relief; attorney's fees, costs, and disbursements; and compensatory damages for the injuries and loss she sustained as a result of Defendants' discriminatory conduct and deliberate indifference as alleged under 42 U.S.C. § 18116(a).

### CLAIM V: Violations of the New York State Human Rights Law

206.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges

them in support of this claim.

207.    At all times relevant to this action, the NYSHRL has been in full force and effect and has applied to Defendants' conduct.

208.    At all times relevant to this action, Ms. Odermatt has been substantially limited in the major life activities of sleeping, concentrating, and cognition and thus is a qualified individual with a disability within the meaning of N.Y. Exec. Law § 292(21).

209.    At all times relevant to this action, Defendants' facilities have been places of public accommodation within the meaning of N.Y. Exec. Law § 292(9).

210.    Under the NYSHRL, it "shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation . . . because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof . . . to the effect that any of the accommodations, advantages, facilities or privileges of any such place shall be refused, withheld from or denied to any person on account of . . . disability. . . or that the patronage or custom threat of any person of . . . or having a disability is unwelcome, objectionable or not acceptable, desired or solicited." N.Y. Exec. Law § 296(2)(a).

211.    Under N.Y. Exec. Law § 296(2)(c)(i), discrimination includes "a refusal to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford facilities, privileges, advantages or accommodations to individuals with disabilities."

212.    The NYSHRL also incorporates the standards from the regulations of the Rehabilitation Act and the ACA. N.Y. Exec. Law §§ 296(2)(a); 300 ("The provisions of [the

NYSHRL] shall be construed liberally for the accomplishment of the remedial purposes thereof, regardless of whether federal civil rights laws, including those laws with provisions worded comparably to the provisions of this article, have been so construed.").

213.    Defendants discriminated against Ms. Odermatt by withholding the accommodations, advantages, facilities or privileges of Defendants' place of public accommodation in violation of N.Y. Exec. Law § 296(2)(a) and by failing to effectively accommodate her disability in violation of N.Y. Exec. Law § 296(2)(c). Defendants also violated the standards of the Rehabilitation Act and the ACA, thereby violating the NYSHRL.

214.    Also, like its federal counterpart, the NYSHRL makes retaliation against a person who opposes unlawfully discriminatory behavior illegal: "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. Exec. Law § 296(7).

215.    Without injunctive relief, Defendants' discrimination will continue because of the retaliatory discharge, and there is a clear risk that Defendants' actions will recur with Ms. Odermatt or other patients with disabilities by virtue of the interaction at Mount Sinai Beth Israel, among others.

216.    Ms. Odermatt is entitled to injunctive relief, compensatory damages, and attorney's fees and costs for the injuries and loss sustained as a result of Defendants' discriminatory conduct under N.Y. Exec. Law § 297(9).

### CLAIM VI:   Violations of the New York City Human Rights Law

217.    Ms. Odermatt incorporates by reference all preceding paragraphs and realleges

them in support of this claim.

218.    At all times relevant to this action, the NYCHRL has been in full force and effect and has applied to Defendants' conduct.

219.    At all times relevant to this action, Ms. Odermatt has been substantially limited in the major life activities of sleeping, concentrating, and cognition and thus has qualified as an individual with a disability within the meaning of N.Y.C. Admin. Code § 8-102(16).

220.    At all times relevant to this action, Defendants have operated a public accommodation within the meaning of N.Y.C. Admin. Code § 8-102(9) and have been a covered entity within the meaning of N.Y.C. Admin. Code §§ 8-102(1) & (17).

221.    Pursuant to the NYCHRL, it shall be unlawful discrimination for "any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation because of . . . disability . . . of any person directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." N.Y.C. Admin. Code § 8-107(4).

222.    Pursuant to the NYCHRL, a covered entity "shall make reasonable accommodation to enable a person with a disability to . . . enjoy the right or rights in question provided that the disability is known or should have been known by the covered entity." N.Y.C. Admin. Code § 8-107(15)(a).

223.    The NYCHRL further requires that places of public accommodations engage in a "cooperative dialogue" with persons who are or may be entitled to an accommodation. N.Y.C. Admin. Code § 8-107(28). This obligation requires a public accommodation to "engage in good faith in a written or oral dialogue concerning the person's accommodation needs; potential accommodations that may address the person's accommodation needs, including alternatives to a

requested accommodation; and the difficulties that such potential accommodations may pose for the covered entity." N.Y.C. Admin. Code § 8-102.

224.    Ms. Odermatt is an aggrieved person within the meaning of N.Y.C. Admin. Code § 8-502(a), which extends a cause of action and relief to "any person claiming to be aggrieved" by the discrimination of a person on the basis of her disability.

225.    Defendants discriminated against Ms. Odermatt on the basis of her disability by withholding the accommodations, advantages, facilities, or privileges of Defendants' medical services in violation of N.Y.C. Admin. Code § 8-107(4)(1)(a); by failing to effectively accommodate Plaintiff's disability in violation of N.Y.C. Admin. Code § 8-107(15)(a); and by failing to engage in a cooperative dialogue in violation of N.Y.C. Admin. Code § 8-107(28).

226.    The NYCHRL also forbids unlawful retaliation:

> "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, . . ., (v) requested a reasonable accommodation under this chapter… The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to … a public accommodation or in a materially adverse change in the terms and conditions of … a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity." N.Y.C. Admin. Code § 8-107(7).

227.    Without injunctive relief, there is a clear risk that Defendants' actions will continue and recur with Ms. Odermatt or other individuals with DSPS and/or ADHD.

228.    Ms. Odermatt is entitled to damages even if the "only injury is the deprivation of a right granted or protected by [the statute]." N.Y.C. Admin. Code § 8-502(h)(2).

229.   Ms. Odermatt seeks an award of compensatory damages for the injuries and loss sustained as a result of Defendants' discriminatory conduct pursuant to N.Y.C. Admin. Code § 8-502(a).

230.   Ms. Odermatt also seeks an award of punitive damages to rectify and deter Defendants' discriminatory conduct pursuant to N.Y.C. Admin. Code § 8-502(a).

231.   Ms. Odermatt is further entitled to an award of attorney's fees, costs, and disbursements pursuant to N.Y.C. Admin. Code § 8-502(g).

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Emily Odermatt respectfully requests that this Court:

A.     Issue a declaratory judgment that Defendant subjected Plaintiff to:

   i.     physical, financial, and emotional harm in violation of Title III of the Americans with Disabilities Act, Title V of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, the New York Human Rights Law, and the New York City Human Rights Law.

B.     Issue an injunction forbidding Defendants from implementing or enforcing any policy, procedure, or practice that denies individuals with DSPS and/or ADHD meaningful access to, and full and equal enjoyment of, Defendants' facilities, services, or programs in violation of Title III of the Americans with Disabilities Act, Title V of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Section 1557 of the Patient Protection and Affordable Care Act, the New York Human Rights Law, and the New York City Human Rights Law;

C.     Issue an injunction ordering Defendants to:

   i.   reverse Ms. Odermatt's discharge;

       ii.   reinstate Ms. Odermatt to outpatient mental health care at the Mount Sinai Hospital Adult Outpatient Psychiatry Clinic located at 1160 Fifth Avenue, with accommodations, on equal footing to other clinic patients; and

      iii.   amend Ms. Odermatt's discharge records to reflect the reversal, the reinstatement, and the relevant facts regarding the basis for such;

      iv.   promptly reeducate the clinical and administrative staff about their obligations under city, state, and federal civil rights laws.

D.    Award to Plaintiff:

      i.   Nominal damages;

      ii.   Compensatory damages;

      iii.   Punitive damages;

      iv.   Reasonable costs and attorney's fees;

      v.   Interest on all amounts at the highest rates and earliest dates allowed by law; and

      vi.   Any and all other relief that this Court deems just and appropriate.

Dated: July 11, 2024                   Respectfully submitted,

_David J Hommel_

_____

David John Hommel
**EISENBERG & BAUM, LLP**
24 Union Square East, PH
New York, NY 10003
(212) 353-8700
dhommel@eandblaw.com
*Attorneys for Plaintiff*