UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMILY ODERMATT,

                                    Plaintiff,

            -against-

THE MOUNT SINAI HOSPITAL, MOUNT
SINAI HEALTH SYSTEM, INC., and
MOUNT SINAI HOSPITALS GROUP, INC.,

                                    Defendants.

---

Case No. 1:24-cv-05250 (JLR)

**OPINION AND ORDER**

JENNIFER L. ROCHON, United States District Judge:

Plaintiff Emily Odermatt ("Plaintiff"), proceeding without counsel, asserts claims for

discrimination and retaliation against Defendants The Mount Sinai Hospital, Mount Sinai Health

System, Inc., and Mount Sinai Hospitals Group, Inc. (together, "Mount Sinai"), because they

allegedly failed to accommodate her disabilities and discharged her from care when she opposed

that failure.  Mount Sinai moves for summary judgment on all of Plaintiff's claims.  For the

reasons below, the Court GRANTS Mount Sinai's motion.

## BACKGROUND

### I.    Procedural History

Plaintiff initiated this action on July 11, 2024.  *See generally* Dkt. 1 (the "Complaint" or

"Compl.").  She alleges that Mount Sinai violated Title III and Title V of the Americans with

Disabilities Act ("ADA"), 42 U.S.C. § 12181 *et seq.*, Compl. ¶¶ 162-82; Section 504 of the

Rehabilitation Act ("RA"), 29 U.S.C. § 794, *id.* ¶¶ 183-96; Section 1557 of the Patient Protection

and Affordable Care Act ("ACA"), 42 U.S.C. § 18116, *id.* ¶¶ 197-205; the New York State

Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 296 *et seq.*, *id.* ¶¶ 206-16; and the New

York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code 8-107 *et seq.*, *id.* ¶¶ 217-31.[1]

Mount Sinai moved for summary judgment on Plaintiff's claims on July 31, 2025.  *See*

Dkt. 144; Dkt. 145 ("McEvoy Decl."); Dkt. 146 ("Van Dyck Decl."); Dkt. 147 ("New Decl.");

Dkt. 148 ("Br."); Dkt. 149 ("Joint Statement of Undisputed Facts," or "JSUF"); Dkt. 150

("Defendants' Statement of Undisputed Facts," or "Def. SUF").  That motion is fully briefed.

*See* Dkt. 198 ("Opp."); Dkt. 185; Dkt. 187 ("Beth Israel Decl."); Dkt. 191 ("ADHD Decl.");

Dkt. 193 ("DSPS Decl."); Dkt. 205 ("Pl. RSUF"); Dkt. 206 ("Reply"); Dkt. 207 ("Def. RSUF");

Dkt. 210 ("First Sur-Reply"); Dkt. 211 ("Pl. SUF");[2] Dkt. 213 ("Second Sur-Reply").

## II.    Relevant Facts

The Court draws the following facts from the parties' joint statement, the facts presented

by Mount Sinai that Plaintiff does not dispute (or that she disputes for immaterial reasons or

without citing sufficient evidence), as well as the facts presented by Plaintiff that the Court finds

to be supported by the record evidence.  Where the Pl. RSUF responds to Mount Sinai's factual

statements with variations of "I do not know whether this is true," *see, e.g.*, Pl. RSUF ¶ 17, and

---

[1] At the outset of this litigation, Plaintiff was represented by counsel.  *See generally* Compl.
Counsel moved to withdraw on February 4, 2025, *see* Dkt. 46, and the Court granted that motion
on February 28, 2025.  Dkt. 58.  Plaintiff is now proceeding *pro se*.

[2] By letter dated October 13, 2025, Mount Sinai informed the Court that Plaintiff had sent Mount
Sinai her Rule 56.1 counterstatement on September 11, 2025, and that it "lacked evidentiary
support for the majority of its statements."  Dkt. 218 at 1.  Mount Sinai filed its responses
accordingly.  *See generally* Def. RSUF.  The Pl. SUF, however, includes citations that its draft
version lacked; thus, Mount Sinai has responded to a different Rule 56.1 statement than the one
Plaintiff docketed.  Dkt. 218 at 1.  Plaintiff conceded that these events had occurred.  *See
generally* Dkt. 220.  Mount Sinai asked that the Court disregard the Pl. SUF and order Plaintiff to
file the original version.  Dkt. 218 at 2.  In light of Plaintiff's *pro se* status, and given that the
asserted facts from Plaintiff's counterstatement are also used in her opposition brief, the Court
will consider the Pl. SUF to the extent its statements are supported by the evidence, and will
consider Mount Sinai's Reply as, in part, a response to the Pl. SUF.

where Mount Sinai has offered sufficient factual evidence to support its statements, the Court deems those facts admitted. *See Ezagui v. City of New York*, 726 F. Supp. 2d 275, 285 n.8 (S.D.N.Y. 2010) ("A party's statement that it 'can neither admit nor deny [an adversary's] statement based upon the factual record is not a sufficient response to establish a disputed fact[.]'" (quoting *Universal Calvary Church v. City of New York*, No. 96-cv-04606 (RPP), 2000 WL 1745048, at *2 n.5 (S.D.N.Y. Nov. 27, 2020))); *Schwartz v. Allstate Ins. Co.*, No. 20-cv-00079 (JMW), 2023 WL 2742059, at *1 (E.D.N.Y. Mar. 31, 2023) (finding that similar statements "are not sufficient responses under Local Rule 56.1 when, as here, the defendant has cited to admissible evidence in support of its factual assertions"); *accord Russell v. Aid to Developmentally Disabled, Inc.*, 753 F. App'x 9, 12 (2d Cir. 2018) (summary order).

Mount Sinai operates a psychiatry clinic (the "Clinic") in Manhattan. JSUF ¶ 1. The Clinic's patient population consists largely of referrals from other sources, such as Mount Sinai's own hospital system and providers, and it treats patients diagnosed with disorders "ranging from mild to severe." Pl. RSUF ¶¶ 1-2. According to Mount Sinai, the Clinic had "an average of 1,186 active patients" between September 2023 and February 2024, and "an average of 272" of them each month were considered "high risk, moderate risk, and/or in need of complex care." Pl. RSUF ¶¶ 8-9. The Clinic treats its patients using "monthly medication management" and "a short-term psychotherapy approach." *Id.* ¶ 10. Under that "practice model," the Clinic endeavors to "see[] a patient once every one to three months," although "twice-monthly sessions" may be used during "a patient's introduction to the Clinic." *Id.* ¶ 13. "Long-term therapy" is not the Clinic's focus. *Id.* ¶ 12. At all times pertinent to this matter, the Clinic's medical staff included Dr. Laura van Dyck (a resident who had primary responsibility for Plaintiff's care), Dr. Antonia New (who supervised residents at the clinic), Dr. Frederick Limson

3

(an attending physician and Director of Residents), and Dr. Nitin Toteja (Director of Ambulatory Psychiatry).  *Id.* ¶¶ 4-7.

Plaintiff was an internal referral to the Clinic, *id.* ¶ 20, and she was a patient there from September 2023 to February 2024.  *Id.* ¶¶ 3, 8; Compl. ¶ 4.  Plaintiff's intake appointment at the Clinic was on September 26, 2023, at 2:30 p.m.  Pl. RSUF ¶ 24.  The day before, Plaintiff "file[d] a complaint" with Mount Sinai because the appointment was in-person and scheduled at 2:30 p.m., and she had previously requested "a late afternoon appointment," or a slightly earlier tele-health appointment, to accommodate her sleep disorder, Delayed Sleep Phase Syndrome ("DSPS").  McEvoy Decl. Ex. 5, at 2.  She advised Mount Sinai that, in light of this scheduling issue, she had "concerns regarding" "disability discrimination and failure to accommodate for [her] intake" and "failure to accommodate, generally."  *Id.*  In the same email, Plaintiff stated that she "would like all of [her] clinic appointments to take place in the afternoon (defined roughly as after 2:30 PM, if telehealth, or 3:00 PM, if in-person)," *id.* at 3, and that she "want[ed] a note placed in [her] chart that all (verbal) communications to her . . . shall not be initiated earlier than 3:00 PM (unless there is a life-threatening emergency[)]," *id.* at 3-4.  *See also* Van Dyck Decl. Ex. C, at 18 (January 6, 2024 message in which Plaintiff requested "late afternoon" appointments and noted that "[g]enerally speaking, the late afternoon refers to after 3:00 PM").  At her deposition in this matter, Plaintiff testified that these requested times were "based on her own calculations," JSUF ¶ 3, and nothing in the record suggests that these specific times are a medical accommodation for DSPS.  Moreover, although Plaintiff advised Mount Sinai in this email that she had been diagnosed with DSPS, she did not provide Mount Sinai with a sleep study indicating as much.  Pl. RSUF ¶ 30.

Notwithstanding her emailed complaint, Plaintiff attended the intake appointment as scheduled.  Compl. ¶ 41.  Indeed, Plaintiff contends she arrived thirty minutes before the

4

appointment time, as required, to complete a patient registration process.  *Id.*; *see* Pl. RSUF ¶ 24.

Plaintiff brought with her to that appointment a printed PowerPoint presentation about herself,

which included "non-negotiables" for her care.  JSUF ¶ 4.  Those non-negotiables included the

following: "We will be meeting weekly, unless the clinic is completely closed (e.g., due to the

holidays) and at least until I establish myself with a suitable therapist (by my standards)[.]"  *Id.*

     After her intake, Plaintiff was seen at the Clinic for the following appointments:

- October 10, 2023: 4:30 p.m., telehealth;

- October 17, 2023: 1:30 p.m., telehealth;

- October 23, 2023: 4:00 p.m., telehealth;

- November 14, 2023: 5:00 p.m., telehealth;

- November 22, 2023: 2:00 p.m., in-person;

- December 6, 2023: 3:00 p.m., telehealth;

- December 18, 2023: 5:00 p.m., in-person;

- January 5, 2024: 2:00 p.m., telehealth;

- January 19, 2024: 2:00 p.m., telehealth.

Pl. RSUF ¶ 49.  Thus, from October 2023 to January 2024, Plaintiff was seen for appointments at

the Clinic at least twice a month.  Pl. RSUF ¶ 47.  In seven of these nine appointments, she was

seen either at or thirty minutes before her requested accommodation time.  *See* McEvoy Decl.

Ex. 5, at 2 (requesting appointments "in the afternoon (defined *roughly* as after 2:30 PM, if

telehealth, or 3:00 PM, if in-person)" (emphasis added)); Van Dyck Decl. Ex. C, at 18 (defining

"late afternoon" as "3:00 PM" "[g]*enerally speaking*" (emphasis added)).  Mount Sinai told

Plaintiff that the November 22, 2023 appointment was scheduled before 2:30 p.m. because it was

the day before Thanksgiving and the Clinic was closing early, and because Plaintiff needed an

EKG and the technician was available at that time.  Pl. RSUF ¶ 52; *see also* McEvoy Decl. Ex. 3, at 173:7-23.

Despite her accommodation request for afternoon appointments, Plaintiff attended multiple other appointments in the early morning while she was a patient at the Clinic: an oral surgery appointment at 8:30 a.m., two urgent care visits at 8:30 a.m., an appointment with a Weill Cornell provider at 9:30 a.m., and an NYU appointment at 9:30 a.m.  Pl. RSUF ¶ 37.[3] There is also evidence that Plaintiff attended an appointment at a diagnostic vocational evaluation program at 12:00 p.m.  *Id.* ¶ 38.  Moreover, Plaintiff attended "various 1:00 PM and 2:00 PM meetings and medical appointments during and after her time at the Clinic, including a May 28, 2024 cardiology appointment and psychotherapy appointments on July 12, 2024, February 21, 2025, and March 7, 2025."  JSUF ¶ 6.  Plaintiff further testified that she attended her 5:00 p.m. appointment at the Clinic on December 18, 2023, after having had bloodwork done at another Mount Sinai location at 1:30 p.m. the same day, McEvoy Decl. Ex. 3, at 175:21-177:8, and that during this same period she attended two telehealth appointments with other providers at 11:00 a.m. and 2:00 p.m., *id.* at 238:8-240:22.

During her January 5, 2024 appointment at the Clinic, Plaintiff became upset with Dr. van Dyck regarding certain treatment decisions the doctor had made with respect to her medication for Attention Deficit Hyperactivity Disorder ("ADHD").  Pl. RSUF ¶ 57.  Through MyChart messages, Plaintiff later expressed her frustration to Dr. van Dyck, advising that the doctor's "recommendations" of certain new medications were "incomplete" and instructing the

---

[3] In her response to this statement, Plaintiff offers various explanations for these appointments, including that they were for emergencies and therefore could not be rescheduled.  *See* Pl. RSUF ¶ 37; *see also* Dkt. 145-4 at 240:11-17 (Plaintiff deposition testimony: "So any emergency situation including my Mount Sinai visit to the ER . . . overrides my need for sleep, because, you know, your heart can probably kill you and that is less preferable than sleep dep[rivation].").

doctor to "come prepared with evidence" for her treatment suggestions at their next appointment. Van Dyck Decl. Ex. C, at 21.  She also sought "explanations to answer some of the questions that [Plaintiff] brought up during [their] last appointment" and recited those questions "[t]o help [the doctor] remember what those were," *id.* at 26; she also promised to send additional questions "ASAP so that [the doctor] can have an adequate time to seek mentorship, research, and/or prepare," *id.* at 22.  Although Plaintiff disputes this characterization, Dr. van Dyck also testified that Plaintiff generally "belittl[ed] and devalu[ed]" her during their appointments, such as by "referring to me as 'Baby Doctor'"; that Plaintiff frequently sought to "discuss[] medical research" during their appointments "instead of her treatment"; and that Plaintiff "frequently sent [Dr. van Dyck] academic articles via MyChart, including one on Christmas Eve 2023."  Van Dyck Decl. ¶¶ 11-12; *see also* Dkt. 185-1 at 53 (Dr. New email to Mount Sinai staff stating that Plaintiff "barrages Dr. [v]an Dyck with research papers and wants to spend her sessions going over them").

In an internal email dated January 9, 2024, Dr. Toteja told Dr. van Dyck and others that he had spoken with Plaintiff about her frustration, that he understood her to be "asking for a second opinion around choice of ADHD medication," and that he had offered to "help connect her elsewhere" because "there is no second opinion within the [C]linic."  Dkt. 185-1 at 43.  The next weekend, Plaintiff called Dr. van Dyck and left a voicemail stating that "a storm is coming." Pl. RSUF ¶ 63.  Both Dr. van Dyck and Dr. New described this voicemail as "threatening," Van Dyck Decl.¶ 14; New Decl. ¶ 11, and Dr. New sought guidance from Mount Sinai's Patient and Family Engagement Committee ("PFEC") because she was "[c]oncerned and troubled" by it, Pl. RSUF ¶ 64.

Meanwhile, on January 15, 2024, Plaintiff emailed Mount Sinai's Patient Relations group concerning a "pair of calls" she had had with Dr. Toteja the week before, alleging that Dr. Toteja

had offered to provide her "referrals for outside providers" rather than reasonable accommodations. New Decl. Ex. B, at 2. The only accommodation she identified in that email was "holding the frequency of my visits to biweekly instead of decreasing monthly." *Id.* Mount Sinai saw Plaintiff for an appointment on January 19, 2024, Pl. RSUF ¶ 49, and responded to her complaint by letter dated January 30, 2024, advising in part that:

> We understand that you had concerns that the staff were not following ADA reasonable accommodations guidelines with regard to your appointment time requests. We want to clarify that the Ambulatory Psychiatric clinic typically schedules patients for monthly medication management. You were offered psychotherapy with a social worker in the clinic which is designated as "short term" in orientation paperwork. We understand that you asked for weekly meetings with the psychiatry resident as your ADHD makes it challenging for you to get all the answers you need in monthly meetings. Please know that this is not an appropriate ADA reasonable accommodation request.

New Decl. Ex. B, at 4. In an email dated February 2, 2024, Plaintiff told Mount Sinai that she "vehemently disagree[d]" and stated that, "as a person with a disability" who required "extra time," she had sufficiently demonstrated that the accommodation of "more than monthly care" was reasonable. *Id.* at 9.

In response to Dr. New's request for guidance, the PFEC met and recommended issuing Plaintiff a behavior plan (the "Behavior Plan"). Pl. RSUF ¶¶ 64-65. The Behavior Plan included "patient expectations" such as "treat[ing] the staff, physicians, and fellow patients with respect," "not us[ing] bad or abusive language or behavior," "not mak[ing] inappropriate comments towards staff," "respect[ing] professional boundaries between patients and staff," and "not direct[ing] care." JSUF ¶¶ 13-14. Emails between Mount Sinai staff indicate that the PFEC (and others at Mount Sinai) believed discharging Plaintiff may also be an appropriate course of action. *See* Dkt. 185-1 at 15-18. One employee advised that Plaintiff had "demand[ed] communication via email" concerning her recent complaints, "wonder[ed] if [she] should just send the [B]ehavior [P]lan via email," and predicted that Plaintiff would "likely escalate." *Id.* at 18. The

same employee suggested that Mount Sinai could "just move forward with discharge at this point." *Id.* Dr. Toteja responded by suggesting "discharg[ing]" Plaintiff "with referrals," as "[a]ny further discussions around [the] [B]ehavior [P]lan will only lead to further escalation." *Id.* Mount Sinai's Director of Service Excellence informed the others that PFEC's determination had been to discharge Plaintiff "if she didn't cooperate with the behavioral agreement," that Plaintiff "ha[d] not engaged with us to discuss the [B]ehavior [P]lan," and that "[her] suggestion [was] to send it to [Plaintiff] via email. She will refuse and we can then move to [discharge]." *Id.* at 16.

On February 8, 2024, Mount Sinai provided the Behavior Plan to Plaintiff, Pl. RSUF ¶ 66, explaining that "we will need your understanding of these guidelines in order to continue a productive and therapeutic relationship," Dkt. 185-1 at 6. Plaintiff declined to sign it. Pl. RSUF ¶ 68. She advised Mount Sinai of her decision by email dated February 8, 2024, in which she likened signing the Behavior Plan to "sign[ing] away [her] rights to fully accessible, accommodated care" at Mount Sinai. *See* Dkt. 185-1 at 5. Accordingly, Mount Sinai discharged her the same day. *See* McEvoy Decl. Ex. 15.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure ("Rule") 56, a court may grant summary judgment on any claim or defense where the moving party "shows that there is no genuine dispute as to any material fact and the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A material fact is one that would 'affect the outcome of the suit under the governing law,'" and thus "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Tarpon Bay Partners LLC v. Zerez Holdings Corp.*, 79 F.4th 206, 220-21 (2d Cir. 2023) (first quoting *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 72 (2d Cir. 2022); and then quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1987)). A genuine dispute is one in which

"the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." *Id.* at 220 (alteration adopted) (quoting *Aetna*, 52 F.4th at 72).

On such a motion, the Court "constru[es] the evidence in the light most favorable to the [nonmoving party] . . . [,] drawing all reasonable inferences and resolving all ambiguities in [her] favor." *Jaffir v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018) (second and final alteration in original) (quoting *Darnell v. Pineiro*, 849 F.3d 17, 22 (2d Cir. 2017)). Moreover, "'[i]t is well established that a court is ordinarily obligated to afford a special solicitude to *pro se* litigants,' 'particularly where motions for summary judgment are concerned.'" *Harris v. Miller*, 818 F.3d 49, 57 (2d Cir. 2016) (first quoting *Tracy v. Freshwater*, 623 F.3d 90, 101 (2d Cir. 2010); and then quoting *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014)).

## DISCUSSION

Mount Sinai seeks summary judgment on the merits on several grounds. As a threshold matter, however, Mount Sinai seeks summary judgment on its contention that Plaintiff does not have Article III standing to assert her claims. The Court is duty-bound to address that argument first, "before proceeding to the merits of a case." *Dep't of Educ. v. Brown*, 600 U.S. 551, 560 (2023); *accord Steven v. Carlos Lopez & Assocs., LLC*, 422 F. Supp. 3d 801, 803 (S.D.N.Y. 2019).

### I.    Standing

This Court's power is confined, by Article III of the Constitution, to cases and controversies in which the plaintiff has a "personal stake." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). A plaintiff establishes that stake by showing "(i) that [s]he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *Calcano v. Swarovski N. Am. Ltd.*, 36 F.4th 68, 74 (2d Cir. 2022) (quoting *TransUnion*,

594 U.S. at 423).  Here, Mount Sinai argues that Plaintiff has failed to demonstrate an injury in fact "because it is undisputed that Plaintiff was never denied medical care or treatment, nor was she excluded from the Clinic."  Br. at 13.  It further alleges that Plaintiff cannot demonstrate a threat of future harm because Mount Sinai has sufficient "policies and trainings in place regarding the provision of accommodations" that would safeguard her rights if the Court were to grant her the injunctive relief she seeks of reinstatement at the Clinic.  *Id.* at 15.

At bottom, these arguments concern the merits of Plaintiff's claims, and "the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 612 (1989) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)); *see also SM Kids, LLC v. Google LLC*, 963 F.3d 206, 212 (2d Cir. 2020) ("We have cautioned against arguments that 'would essentially collapse the standing inquiry into the merits,' and attempts to 'conflate the threshold question of [the plaintiff's] standing under Article III . . . with the question of whether [he] has a valid claim on the merits.'" (alterations in original) (citation omitted) (first quoting *Baur v. Veneman*, 352 F.3d 625, 642 (2d Cir. 2003); and then quoting *Lerman v. Bd. of Elections*, 232 F.3d 135, 143 n.9 (2d Cir. 2000))).  As to Mount Sinai's first argument, the undisputed facts demonstrate that Plaintiff was discharged from Mount Sinai on February 8, 2024, Dkt. 185-1 at 3, which is plainly an exclusion from the Clinic for purposes of Plaintiff's standing.  Mount Sinai's arguments as to threat of future harm misunderstand the nature of Plaintiff's case, which is that her continued exclusion from the Clinic represents an ongoing harm for which she seeks redress.

Whether this exclusion is discriminatory or retaliatory is a separate question that does not affect Plaintiff's access to the federal court system to press her claims.  *See Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 800 (2015) ("[O]ne must not 'confuse weakness on the merits with absence of Article III standing[,]' . . . [which] 'often turns

11

on the nature and source of the claim asserted,' but . . . 'in no way depends on the merits' of the claim." (first quoting *Davis v. United States*, 564 U.S. 229, 249 n.10 (2011); and then quoting *Warth*, 422 U.S. at 500).  Therefore, Mount Sinai's motion for summary judgment on standing is denied.

## II.    Merits

Plaintiff brings two sets of claims against Mount Sinai: one for discrimination under federal, state, and city law, and the other for retaliation under federal and state law.  Turning to the merits of those claims, the Court finds, for the reasons set forth below, that no reasonable jury could return a verdict in Plaintiff's favor on these claims, and accordingly will grant summary judgment to Mount Sinai.

### A.    The Discrimination Claims

Plaintiff's first set of claims against Mount Sinai are for discrimination under Title III of the ADA, Section 504 of the RA, Section 1557 of the ACA, the NYSHRL, and the NYCHRL.

Title III of the ADA prohibits discrimination against disabled individuals "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation."  42 U.S.C. § 12182(a).  A plaintiff suing under that title must "establish that (1) he or she is disabled within the meaning of the ADA; (2) that the defendants own, lease, or operate a place of public accommodation; and (3) that the defendants discriminated against the plaintiff within the meaning of the ADA."  *Roberts v. Royal Atl. Corp.*, 542 F.3d 363, 368 (2d Cir. 2008).  A plaintiff may prove the third element through "a failure to make reasonable modifications in policies, practices, or procedures . . . unless the entity can demonstrate that making such modifications would fundamentally alter the nature of [its] . . . services."  42 U.S.C. § 12182(b)(2)(A)(ii).  "Thus, under the ADA, a 'defendant is not required to offer an accommodation that imposes an undue hardship on its program's operation;

12

it is only required to make a reasonable accommodation.'" *Shaywitz v. Am. Bd. of Psychiatry & Neurology*, 848 F. Supp. 2d 460, 466 (S.D.N.Y. 2012) (quoting *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 88 (2d Cir.2004), *opinion corrected*, 511 F.3d 238 (2d Cir. 2004)).

Similarly, to establish a violation of the Rehabilitation Act, "a plaintiff must show (1) that the plaintiff is a 'qualified individual' with a disability; (2) that a defendant 'receive[s] federal funding;' and (3) that the plaintiff was 'denied the opportunity to participate in or benefit from defendants' services, programs, or activities, or was otherwise discriminated against by defendants, by reason of her disability.'" *Bahl v. New York Coll. of Osteopathic Med. of N.Y. Inst. of Tech.*, 683 F. Supp. 3d 224, 232 (E.D.N.Y. 2023) (quoting *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003)). This amounts to the same requirement as the ADA: "In short, the Rehabilitation Act and [Title III] of the ADA prohibit discrimination against qualified disabled individuals by requiring that they receive 'reasonable accommodations' that permit them to have access to and take a meaningful part in public services and public accommodations." *Powell*, 364 F.3d at 85 (quoting 29 U.S.C. § 794(a)). Finally, Section 1557 of the ACA tracks the RA: it prohibits federally funded health programs from discriminating against any individual on any basis protected by Section 504 of the RA, and it provides that, where a Section 1557 claim is rooted in RA discrimination, the RA's "enforcement mechanism[]" applies to the ACA claim. 42 U.S.C. § 18116(a).

The NYSHRL and NYCHRL also both "apply the same standard for failure to accommodate cases under the ADA." *Ruderman v. L. Off. of Yuriy Prakhin, P.C.*, No. 19-cv-02987 (RJD) (RLM), 2022 WL 20538757, at *9 (E.D.N.Y. Jan. 25, 2022) (quoting *Lawtone-Bowles v. City of New York*, No. 17-cv-08024 (WHP), 2019 WL 652593, at *6 (S.D.N.Y. Feb. 15, 2019)). However, "the NYSHRL is to be construed co-extensively with the RA, and the NYCHRL is to be interpreted more liberally than the RA." *Nieves v. Plaza Rehab. & Nursing*

13

*Ctr.*, No. 20-cv-01191 (JLR) (OTW), 2023 WL 4763945, at \*11 (S.D.N.Y. July 26, 2023).  Even so, under the NYCHRL, the most liberally construed statute at issue here, reasonable accommodations are those "that can be made that shall not cause undue hardship in the conduct of the covered entity's business," taking into account "the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility" and "the type of operation or operations of the covered entity."  N.Y.C. Admin. Code § 8-102(18)(b), (d).

The common requirement in all these statutes, then, is the provision of reasonable accommodation.  Accordingly, the Court need not resolve the parties' extensive disagreement over whether Plaintiff has sufficiently established that she is disabled within the meaning of these laws, *see* Br. at 18-19; Opp. at 10-14; Second Sur-Reply at 4-7; ADHD Decl.; DSPS Decl., because even assuming that she has, her discrimination claims all turn on whether Mount Sinai provided her with reasonable accommodation.  Plaintiff sought two such accommodations from Mount Sinai: afternoon appointments, JSUF ¶ 2, and ongoing biweekly appointments, New Decl. Ex. B, at 9.  The Court addresses each in turn.

### 1.    *Afternoon Appointments*

Plaintiff's first accommodation request was for "afternoon" or "late afternoon" appointments, which she defined "roughly" and "generally" as after 2:30 p.m. for telehealth and after 3:00 p.m. for in-person.  McEvoy Decl. Ex. 5, at 3 (Plaintiff requesting Clinic appointments "in the afternoon (defined roughly as after 2:30 PM, if telehealth, or 3:00 PM, if in-person)"); Van Dyck Decl. Ex. C, at 18 (Plaintiff defining "late afternoon" as "[g]enerally speaking . . . refer[ring] to after 3:00 PM").  She sought these appointments as an accommodation of her sleep disorder, DSPS.  *See*, *e.g.*, McEvoy Decl. Ex. 5, at 2.

Assuming that Plaintiff's accommodation request was reasonable — and indeed, "the NYCHRL does not require that plaintiff[s] demonstrate that [their] requested accommodation

14

was reasonable," *Baker v. MTA Bus Co.*, No. 18-cv-12231 (TMR), 2023 WL 4896686, at *32 (S.D.N.Y. Aug. 1, 2023) — the undisputed evidence establishes that Mount Sinai scheduled Plaintiff in strict accordance with her requested times for five of her nine appointments at the Clinic. *See* Pl. RSUF ¶ 49. For two additional appointments, Mount Sinai scheduled Plaintiff only thirty minutes earlier than her "roughly" defined window. *Id.* And for the other two appointments, Mount Sinai scheduled Plaintiff one hour earlier than her requested timeframe; but, for one of those appointments, the Clinic was closing early the day before Thanksgiving, and Mount Sinai needed to plan around the schedule of an EKG technician who would provide testing services for Plaintiff. *See id.* ¶ 52; *see also* McEvoy Decl. Ex. 3, at 173:7-23. The evidence also establishes that Plaintiff was not excluded from medical care as a result of these appointment times, as she did not miss any of the afternoon appointments Mount Sinai scheduled for her.

No reasonable jury could find, on these facts, that Mount Sinai failed to accommodate Plaintiff. To the extent some appointments did not conform perfectly to Plaintiff's stated needs, that imperfection does not give rise to a failure to accommodate claim, because "a granted accommodation . . . need not be perfect." *Porter v. Dartmouth-Hitchcock Med. Ctr.*, 92 F.4th 129, 155 (2d Cir. 2024); *see also Whitney v. Montefiore Med. Ctr.*, No. 23-7961, 2025 WL 2101512, at *5 (2d Cir. July 28, 2025) (summary order) (affirming summary judgment award to employer where employee did not "identif[y] evidence that would allow a jury to conclude that [defendant]'s failure to comply perfectly with the granted accommodations somehow rendered the accommodations as a whole unreasonable"); *Murray v. City of New York*, No. 23-cv-10031 (PAE), 2024 WL 3553266, at *15 (S.D.N.Y. July 26, 2024) (explaining that even the NYCHRL does not require a perfect accommodation).

Moreover, as to Plaintiff's claims under statutes other than the NYCHRL, nothing in the record ties Plaintiff's specifically requested appointment timeframe to her disabilities — for example Plaintiff did not provide a physician's recommendation that her in-person appointments begin no earlier than 3:00 p.m. *See Lopez v. N.Y.C. Dep't of Homeless Servs.*, No. 17-cv-03014 (VEC) (OTW), 2019 WL 3531955, at *5 (S.D.N.Y. Aug. 2, 2019) (dismissing ADA failure to accommodate claim where plaintiff "allege[d], with supporting physicians' notes, that her medical needs require[d] privacy, *e.g.*, a private room, . . . [but failed to] show[] why any of her disabilities require[d] the removal of all cisgender female occupants from any *building* in which she lives"), *report and recommendation adopted*, 2019 WL 4593611 (S.D.N.Y. Sept. 23, 2019). Indeed, Plaintiff concedes that her proposed times were the result of "her own calculations." JSUF ¶ 3. And there is no evidence in the record that would permit a reasonable jury to conclude that an appointment at 3:00 p.m. is a suitable accommodation but an appointment at 2:30 p.m. is not. *See Harnett v. Fielding Graduate Inst.*, 400 F. Supp. 2d 570, 577-78 (S.D.N.Y. 2005) (granting summary judgment to defendant under ADA and RA where plaintiff's requested accommodation would decrease her 45-mile commute by up to three miles, but "[n]o reasonable trier of fact could conclude that, in the context of a 45 mile commute, two or three miles is a difference that makes a difference"), *aff'd in part and rev'd in part on other grounds*, 198 F. App'x 89 (2d Cir. 2006) (summary order); *see also Harnett*, 198 F. App'x at 92 (noting also that plaintiff had failed to provide any "medical evidence that a two to three mile difference in [her] commute would have made a difference to her health").

The Court notes further that there is ample evidence in the record that Plaintiff attended other appointments earlier than the range she requested from Mount Sinai, which would further foreclose a reasonable jury from finding that Mount Sinai failed to accommodate Plaintiff by providing her with appointments that generally, although not always perfectly, fit her requested

timeframe.  *See* Pl. RSUF ¶¶ 37-38; JSUF ¶ 6; McEvoy Decl. Ex. 3, at 175:21-177:8, 238:8-240:22.  *See, e.g.*, *Bertuzzi v. Copiague Union Free Sch. Dist.*, No. 17-cv-04256 (JS) (ARL), 2023 WL 6594357, at *10 (E.D.N.Y. Jan. 30, 2023) (granting summary judgment to defendant where plaintiff claimed failure to accommodate her mobility issues under ADA and NYSHRL, but evidence demonstrated she routinely walked farther distances than those required by accommodation provided, and thus she was "cherry-pick[ing] when to impose her physicians' recommendations to limit her activity"), *report and recommendation adopted as modified on other grounds*, 2023 WL 621002 (E.D.N.Y. Sept. 25, 2023). [4]

For all these reasons, no reasonable jury could find that Mount Sinai failed to accommodate Plaintiff's DSPS based on appointment times. [5]

### 2.  *Frequency of Appointments*

Plaintiff also requested biweekly appointments at Mount Sinai as an accommodation for her ADHD.  Indeed, Plaintiff explained to Mount Sinai that, due to this disability, she "need[ed] more time in educational environments to understand and process information or instruction that is presented to [her] orally," and therefore she required more frequent appointments at the Clinic. Dkt. 185-1 at 55; *see also id.* at 57 (Plaintiff identifying "one of the accommodations I wanted" as "holding the frequency of my visits to biweekly instead of decreasing monthly").  As with Plaintiff's request for afternoon appointments, however, Mount Sinai provided this

---

[4] As these cited cases demonstrate — and contrary to Plaintiff's assertion, Opp. at 15 — the Court may resolve the question of the reasonableness or effectiveness of a provided accommodation on summary judgment.

[5] Plaintiff also alleges that the Mount Sinai Beth Israel psychiatric clinic later failed to accommodate her with an afternoon intake appointment upon her request in April 2024, and instead offered her an appointment between 1:00 and 3:00 p.m., which she declined to schedule. Beth Israel Decl. ¶¶ 12, 22; *see* Compl. ¶¶ 158-61; Opp. at 7-10.  Plaintiff has not named Mount Sinai Beth Israel as a defendant in this matter but, even if she had, the foregoing analysis applies equally to this claim.

accommodation to Plaintiff. The undisputed evidence demonstrates that Plaintiff had appointments twice each month for the entirety of her time at the Clinic (other than September 2023, because her intake was at the end of that month, and February 2024, because her discharge was at the beginning of that month). Pl. RSUF ¶¶ 47, 49.

To the extent Plaintiff later requested to maintain that schedule rather than reduce to monthly appointments, the Clinic was not required to provide that accommodation. Indeed, "accommodations need not (1) 'fundamentally alter the nature of the service provided,' or (2) 'impose an undue financial or administrative burden'" on the public entity. *Am. Council of Blind New York, Inc. v. City of New York*, 495 F. Supp. 3d 211, 232-33 (S.D.N.Y. 2020) (quoting *Tennessee v. Lane*, 541 U.S. 509, 532 (2004)); *see also Calcano v. True Religion Apparel, Inc.*, No. 19-cv-10442 (VSB), 2022 WL 973732, at *5 (S.D.N.Y. Mar. 31, 2022) ("[T]he ADA does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided." (quoting *Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc.*, 603 F.3d 666, 671 (9th Cir. 2010)); *Falchenberg v. N.Y. State Dep't of Educ.*, 642 F. Supp. 2d 156, 162 (S.D.N.Y. 2008), *aff'd*, 338 F. App'x 11, 13 (2d Cir. 2009) (summary order) (explaining that under ADA, NYSHRL, and NYCHRL, "a defendant need not make an accommodation at all if the requested accommodation would fundamentally alter the nature of the service, program, or activity" (quoting *Powell*, 364 F.3d at 88)).

Here, Mount Sinai has sufficiently demonstrated that Plaintiff's proposed plan would have caused both problems for Mount Sinai. The Clinic was treating "an average of 1,186 active patients" while Plaintiff was a patient there, and "an average of 272" of those patients each month were considered "high risk, moderate risk, and/or in need of complex care." Pl. RSUF ¶¶ 8-9. Moreover, the Clinic's general model is to treat its patients with "monthly medication management," endeavoring to "see[] a patient once every one to three months," with perhaps

18

more frequent appointments during "a patient's introduction to the Clinic." *Id.* ¶¶ 10, 13. In other words — and as Mount Sinai argues, *see* Br. at 21-22 — Plaintiff was not the Clinic's only patient, the Clinic's other patients also needed to be regularly seen, and the Clinic was not structured to continue offering Plaintiff the frequency of appointments she desired for the long term. To require Mount Sinai to continue providing Plaintiff biweekly appointments would change the nature of the services the Clinic is structured to provide and impose undue burden on both Mount Sinai and its other patients, and, as a result, Mount Sinai was under no obligation to acquiesce to Plaintiff's request. *See Harnett*, 400 F. Supp. 2d at 579 (granting summary judgment to school where plaintiff requested accommodation of transfer to another cohort, but preferred cohort "was over-subscribed, and [school] determined that adding plaintiff to the group would disrupt the existing balance"); *Brief v. Albert Einstein Coll. of Med.*, 423 F. App'x 88, 91 (2d Cir. 2011) (affirming summary judgment where student's accommodation request to be permitted to continue studies despite poor grades would require school "to ignore his examination failures as well as its own academic by-laws"); *Abdelsayed v. N.Y. Univ.*, No. 17-cv-09606 (VSB), 2023 WL 4705999, at *10-11 (S.D.N.Y. July 24, 2023) (granting summary judgment to defendant where plaintiff doctor's requested accommodations "raised numerous safety concerns" for his patients, and "safety risks are entirely adverse to the type of operation which a hospital is engaged in" (alterations adopted) (quoting N.Y.C. Admin. Code § 8-102)).

Moreover, "[a]lthough a public entity must make 'reasonable accommodations,' it does not have to provide a disabled individual with every accommodation [s]he requests or the accommodation of [her] choice." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 641 (2d Cir. 2012). Plaintiff concedes, both in her brief and in the Complaint, that biweekly appointments were not the only accommodation suitable to address her need for extra time; rather, she asserts that "non-verbal communication, like email or MyChart messaging to ask questions," would also

constitute a "necessary accommodation[] to comply with the law."  Opp. at 18; *see also* Compl. ¶ 16 (identifying "MyChart messaging" as an "alternate accommodation[]" to "biweekly medication management appointments").  The record evidence, and Plaintiff's own allegations, demonstrate that Mount Sinai gave Plaintiff that accommodation, and that she routinely availed herself of it.  *See generally* Van Dyck Decl. Ex. C (attaching thirty pages of messages Plaintiff sent to Dr. van Dyck via MyChart); *see* Compl. ¶¶ 63, 119, 136, 149 (providing examples of Plaintiff sending or receiving messages through MyChart).  Thus, Mount Sinai provided Plaintiff with one of, if not all of, the accommodations she requested for her ADHD.  *See Fishman v. Off. of Ct. Admin. N.Y. State Cts.*, No. 20-1300, 2021 WL 4434698, at *2-3 (2d Cir. Sept. 28, 2021) (summary order) (affirming dismissal of ADA and RA claims where plaintiff requested computer-assisted real-time transcription services during court proceedings because he "had difficulty remembering the oral instructions of the court," and defendant provided appropriate "alternative accommodations" such as neutral notetaker); *see also Jones-Cruz v. Brookdale Hosp. Med. Ctr.*, No. 19-cv-06910 (MMG), 2025 WL 1617193, at *8 (S.D.N.Y. June 6, 2025) (granting summary judgment to defendant on discrimination claims under ADA and NYCHRL where, "[a]s [p]laintiff admits, [d]efendant in fact granted all of the requests for physical accommodations").  Accordingly, no reasonable jury could find that Mount Sinai failed to accommodate Plaintiff's ADHD.

For all of these reasons, Mount Sinai is entitled to summary judgment on all of Plaintiff's discrimination claims.

## B.       The Retaliation Claims

The second set of Plaintiff's claims are for retaliation under the ADA, the NYSHRL, and the NYCHRL.[6]  To be sure, Mount Sinai's entitlement to summary judgment on Plaintiff's discrimination claims does not require the same result for Plaintiff's retaliation claims.  *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff may prevail on a claim for retaliation [under the ADA] even when the underlying conduct complained of was not in fact unlawful 'so long as [s]he can establish that [s]he possessed a good faith, reasonable belief that the underlying challenged actions of the employer violated [the] law." (third alteration in original) (quoting *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999))); *La Porta v. Alacra, Inc.*, 38 N.Y.S. 3d 20, 22 (N.Y. App. Div. 2016) ("A plaintiff need not establish an underlying [NYS- or NYC]HRL violation in order to prevail on a retaliation claim.").  However, the Court finds that no reasonable jury could conclude that Mount Sinai retaliated against Plaintiff, and thus these claims also fail.

Courts analyze retaliation claims brought under the ADA, NYSHRL, and NYCHRL under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Tafolla v. Heilig*, 80 F.4th 111, 125 (2d Cir. 2023) (applying burden-shifting to ADA and NYSHRL retaliation); *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 75-76 (2d Cir. 2015) (applying burden-shifting to NYCHRL retaliation).  Under that framework, it is Plaintiff's initial burden to make out a *prima facie* case of retaliation — under the ADA, that means she must show that "(i) [she] was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of

---

[6] In her Opposition, Plaintiff argues that the Second Circuit has not yet determined whether the ACA bars retaliation, and she asks this Court to "mak[e] retaliation illegal under the ACA." Opp. at 2-3.  Because the Complaint does not assert a claim for retaliation under the ACA, *see* Compl. ¶¶ 197-205, the Court need not address this argument.

action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Tafolla*, 80 F.4th at 125.  The NYSHRL and NYCHRL's *prima facie* case is "identical" to the ADA's, *Baker v. Bridge Inc.*, 805 F. Supp. 3d 521, 551 (S.D.N.Y. 2025), except that the NYSHRL "employ[s] a more liberal standard" than the ADA, such that Plaintiff must "demonstrate that she took an action opposing [Mount Sinai]'s discrimination and that, as a result, [Mount Sinai] engaged in conduct that was reasonably likely to deter [a person like Plaintiff] from engaging in such action." *Edelman v. NYU Langone Health Sys.*, 141 F.4th 28, 45 (2d Cir. 2025) (alteration adopted) (quoting *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024)).  Similarly, under the NYCHRL, Plaintiff "need establish only that [her] protected activity was a motivating factor behind the defendant's retaliatory action." *Philip v. Gtech Corp.*, No. 14-cv-09261 (PAE), 2016 WL 3959729, at *11 (S.D.N.Y. July 20, 2016).

If Plaintiff meets her *prima facie* burden, then Mount Sinai must "offer legitimate reasons for its actions.  If the defendant satisfies that burden, summary judgment is appropriate if no reasonable jury could conclude either that the defendant's 'reasons were pretextual,' or that the defendant's stated reasons were not its sole basis for taking action, and that its conduct was based at least 'in part on discrimination.'  In other words, summary judgment is appropriate if 'the record establishes as a matter of law' that discrimination *or* retaliation 'played no role' in the defendant's actions." *Chen*, 805 F.3d at 76 (citations omitted) (alteration adopted) (first quoting *Melman v. Montefiore Med. Ctr.*, 946 N.Y.S.2d 27, 35 (N.Y. App. Div. 2012); and then quoting *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 n.8 (2d Cir. 2013)).

Plaintiff's retaliation claims fail at the *prima facie* stage, because no reasonable jury could conclude that her protected activity was "a motivating factor" for Mount Sinai's purported retaliation within the meaning of the NYCHRL. *Philip*, 2016 WL 3959729, at *11.  The NYCHRL provides "uniquely broad and remedial purposes," *Mihalik*, 715 F.3d at 109 (citation

22

omitted), and therefore a claim that fails under the NYCHRL necessarily fails under the NYSHRL and the ADA. *See C.C. v. Google, LLC*, No. 24-cv-07811 (PAE), 2025 WL 1938809, at *11 (S.D.N.Y. July 15, 2025) (explaining that a claim's failure "under the NYCHRL necessarily means that it fails . . . under the NYSHRL as well."); *Mejia v. N.Y.C. Health & Hosps. Corp.*, No. 13-cv-02434 (WHP), 2014 WL 2115109, at *3 (S.D.N.Y. May 19, 2014) ("The NYSHRL provides broader protection from disability discrimination than the ADA; a disability claim that fails under the NYSHRL necessarily fails under the ADA as well."), *aff'd*, 622 F. App'x 70 (2d Cir. 2015) (summary order).

Plaintiff argues that the Behavior Plan presented her with a Hobson's choice, and that she told Mount Sinai that her decision not to sign it was a "refus[al] to sign away [her] rights to fully accessible, accommodated care" at Mount Sinai. Opp. at 1 (quoting Dkt. 185-1 at 3). She contends that this statement was protected speech for which Mount Sinai retaliated against her by discharging her, and thus she argues that "disposition on summary judgment should be based on a reading of [her] refusal." *Id.* at 3. But the evidence demonstrates that Mount Sinai gave Plaintiff a Behavior Plan in response to her behavior and advised her in writing that she must agree to its terms in order to continue her treatment at the Clinic, and that Plaintiff chose not to sign it. Dkt. 185-1 at 3, 6. *See* Pl. RSUF ¶¶ 63-64; Van Dyck Decl. ¶ 14; New Decl. 147 ¶ 11.

Indeed, Mount Sinai expressly told Plaintiff on February 7, 2024, that she could not continue as a patient at the Clinic unless she signed the Behavior Plan. Therefore, no reasonable jury could conclude that Mount Sinai discharged Plaintiff in retaliation for statements that she made later, on February 8, 2024, in connection with her refusal to sign the Behavior Plan. *Cf. Kinard v. Crew*, No. 20-2803, 2021 WL 5023339, at *3 (2d Cir. Oct. 29, 2021) (explaining that, in context of workplace retaliation under NYSHRL, "an employer's decision to 'proceed[] along lines previously contemplated, though not yet definitively determined, is no evidence whatever

23

of causality,' even if final implementation of the previously contemplated adverse employment action takes place after the alleged protected activity" (quoting *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001))); *see White v. Pacifica Found.*, 973 F. Supp. 2d 363, 384-85 (S.D.N.Y. 2013) (applying same concept to, and granting summary judgment to defendant on, NYCHRL retaliation claim).[7]  Plaintiff even concedes that Mount Sinai discharged her from care "due to [her] not signing the Behavior Plan."  Opp. at 1.

Plaintiff also argues that the Behavior Plan was a pretextual reason for her discharge.  *See id.* at 3-4.  But Plaintiff has failed to establish a *prima facie* case for retaliation, and therefore the Court does not reach the question of whether Mount Sinai's stated basis for its action was pretextual.  *See Chen*, 805 F.3d at 76 (explaining that burden-shifting framework requires plaintiff to establish *prima facie* case, then defendant may provide legitimate basis for conduct, then plaintiff may show that basis to be pretextual).  But even assuming Plaintiff had met her initial burden, the evidence demonstrates that Mount Sinai gave Plaintiff the Behavior Plan only after she left a "threatening" voicemail for Dr. van Dyck, Van Dyck Decl. ¶ 14; New Decl. ¶ 11; Pl. RSUF ¶ 64, only after she had engaged in communications with Dr. van Dyck that the doctor found inappropriate, *see* Van Dyck Decl. Ex. C, at 21-22, 26; Van Dyck Decl. ¶¶ 11-12, and only after several months of providing Plaintiff the reasonable accommodations she had requested. *Compare* Opp. at 5 (arguing that Mount Sinai "started retaliating against [Plaintiff's] accommodation requests, and suggesting discharge, before intake"), *with supra*, Section II.A (describing the accommodations Mount Sinai provided at and after intake); *see also Chen*, 805

---

[7] In light of this finding, as well as the Court's findings on Plaintiff's discrimination claims, the Court is not persuaded by Plaintiff's contention that Mount Sinai gave her the Behavior Plan instead of engaging in "a cooperative dialogue to negotiate accommodations" with her.  Opp. at 5. *Cf. E.E.O.C. v. Yellow Freight Sys., Inc.*, No. 98-cv-02270 (THK), 2002 WL 31011859, at *24 (S.D.N.Y. Sept. 9, 2002) ("[T]he failure to engage in an interactive process [under the ADA] is relevant only where it leads to the more fundamental failure to provide an accommodation.").

24

F.3d at 77 (granting summary judgment to defendant school on NYCHRL claim where defendant had noted plaintiff teacher's "overaggressiveness and lack of tact" in dealing with students prior to plaintiff's protected activity).  While there is evidence in the record suggesting that Mount Sinai anticipated Plaintiff's refusal to sign, *see* Dkt. 185-1 at 15-18; *see also* Opp. at 5, nothing in the record suggests that Mount Sinai planned to discharge Plaintiff even if she had, in fact, signed the Behavior Plan.  *See* Dkt. 185-1 at 6 (Mount Sinai email to Plaintiff: "In order to continue providing you with high-quality care, please review the attached document.  We are committed to providing you with the best and most appropriate care moving forward, however we will need your understanding of these guidelines in order to continue a productive and therapeutic relationship.").  No reasonable juror could find that implementing a Behavior Plan that would set parameters for Plaintiff's continued care under these circumstances was unwarranted, much less that it was a pretext for retaliatory discharge.  Moreover, to the extent that Dr. Toteja, early in Plaintiff's time at the Clinic, suggested that Mount Sinai refer her to a provider that might better suit her needs, Mount Sinai did not implement that suggestion.  *See Jones-Cruz*, 2025 WL 1617193, at *8 (explaining that defendant's internal emails "express[ing] skepticism" over whether accommodations would be beneficial "did not constitute a final determination as to [p]laintiff's . . . accommodation requests" under ADA and NYCHRL).

Therefore, no reasonable jury could determine that Mount Sinai's discharging Plaintiff in connection with the Behavior Plan, or even Mount Sinai's creation of the Behavior Plan itself, was at all motivated by discriminatory or retaliatory intent, and Plaintiff's retaliation claims fail under the ADA, NYSHRL, and NYCHRL.[8]

---

[8] Mount Sinai has also moved for summary judgment on Plaintiff's "claims" concerning Mount Sinai's failure to implement policies, procedures, and training of staff members necessary to ensure compliance with federal law.  Br. at 25; *see* Reply at 11.  *See also* Compl. ¶¶ 173, 181 (alleging failure to implement policies under ADA); *id.* ¶ 191 (alleging failure to implement

## III.   Sealing Motions

As a final matter, the Court notes that Plaintiff has requested that certain documents filed in connection with this motion be kept under seal.  *See* Dkt. 183 (Plaintiff's request to file unredacted copies of exhibits to her opposition motion under seal at Dkt. 204); Dkts. 190, 192 (Plaintiff's request to file ADHD Decl. and DSPS Decl. under seal).

"Judicial documents are subject at common law to a potent and fundamental presumptive right of public access[.]"  *Olson v. Major League Baseball*, 29 F.4th 59, 87 (2d Cir. 2022) (quoting *Mirlis v. Greer*, 952 F.3d 51, 58 (2d Cir. 2020)).  In determining whether to restrict that public right, the Court must follow the three-step test articulated by the Second Circuit.  *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006).  First, the Court must "conclude that the documents at issue are indeed 'judicial documents,'" meaning that they are "relevant to the performance of the judicial function and useful in the judicial process."  *Id.* (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)).  Second, the Court "determine[s] the weight of that presumption."  *Id.* (quoting *United States v. Amodeo*, 71 F.3d 1044, 1049 (2d Cir. 1995)).  Third, the Court must weigh that presumption against any countervailing factors.  *Id.* at 120.

"[D]ocuments submitted to a court for its consideration in a summary judgment motion are — as a matter of law — judicial documents to which a strong presumption of access attaches," and such documents "should not remain under seal absent the most compelling

---

policies under RA); *id.* ¶ 204 (alleging failure to implement policies under ACA).  The Court does not construe these allegations as separate claims under these statutes, but rather as support for Plaintiff's requested equitable relief of requiring Mount Sinai to "promptly reeducate" its staff regarding the law.  Compl. at 37-38; *see, e.g.*, 42 U.S.C. § 12188(a)(2) ("Where appropriate, injunctive relief [under the ADA] shall also include requiring the . . . modification of a policy.").  Having granted summary judgment to Mount Sinai on Plaintiff's claims, the Court need not address Plaintiff's requested relief for those claims.

reasons." *Lugosch*, 435 F.3d at 121 (quoting *Joy v. North*, 692 F.2d 880, 893 (2d Cir. 1982)).

Thus, the first two *Lugosch* factors weigh in favor of denying Plaintiff's motions to seal.

However, the documents at issue implicate considerable countervailing factors, as they include

medical records and other medical information, to which a strong privacy interest attaches. *See,*

*e.g.*, *Thor Equities, LLC v. Factory Mut. Ins. Co.*, No. 20-cv-033800 (AT), 2023 WL 6382684, at

*1 (S.D.N.Y. Sept. 29, 2023). Accordingly — and consistent with its previous determination on

Mount Sinai's motion to seal Plaintiff's medical records — the Court GRANTS Plaintiff's

sealing motions at Dkts. 183, 190, and 192. Documents filed under seal on this docket shall

remain under seal.

**CONCLUSION**

For all the foregoing reasons, Mount Sinai's motion for summary judgment is

GRANTED, and Plaintiff's motions to seal are GRANTED. The Clerk of Court is respectfully

directed to terminate all open motions, to maintain under seal all documents currently filed under

seal on the docket, and thereafter to close this case.

Dated: March 13, 2026
New York, New York

SO ORDERED.

_____
JENNIFER L. ROCHON
United States District Judge